606 A.2d 449

**COMMONWEALTH of Pennsylvania**

v.

**Jerome WALL, Appellant.**

Superior Court of Pennsylvania.

Submitted July 29, 1991.

Filed Feb. 26, 1992.

Reargument Denied April 27, 1992.

600

602

■■■■■■■■■

■■■■■■

■■■■■■■■■■

Maryann F. Swift, Philadelphia, for appellant.

Donna G. Zucker, Asst. Dist. Atty., Philadelphia, for Com.

Before OLSZEWSKI, KELLY and BROSKY, JJ.

KELLY, Judge:

In this opinion we are called upon to determine whether a defendant's constitutional right to confrontation is violated by refusing to permit the introduction of evidence of a child sexual abuse victim's prior experience as a prosecutrix in a materially similar sexual assault case. Under the facts of the instant case, we find that the exclusion of such evidence did violate the defendant's right to confrontation. Accordingly, we reverse and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

In June, 1987, appellant and his wife obtained legal custody of their twelve-year-old niece, who had been removed from her mother's home after her mother's paramour was found guilty of sexually abusing her. On February 17, 1989, their niece (hereinafter "the victim") ran away from home and made allegations that appellant had sexually abused her from November, 1988 through January, 1989.[1] Appellant was thereafter arrested and charged with involuntary deviate sexual intercourse and corruption of a minor.

Before trial, appellant filed a motion *in limine* seeking to introduce evidence that the victim had been removed from

1. The Commonwealth subsequently amended the dates involved in this case to include June of 1987 through November, 1988, as well as November, 1988 through January, 1989. N.T. 3/29/90 at 28.

her mother's home and placed in foster care after being sexually assaulted by her mother's paramour. Defense counsel argued in an *in camera* hearing on this issue that evidence of the victim's previous participation in the successful prosecution of an adult male who had sexually abused her was relevant to his defense of fabrication because it tended to show that the victim may have been peculiarly aware of the fact that such a sexual abuse claim could lead to her removal from her aunt's home. Defense counsel urged that in view of the fact that there existed otherwise admissible evidence of the victim's desire to leave her aunt's home because of the strict discipline that her aunt often imposed, the evidence of the victim's prior participation in a materially similar prosecution was logically necessary to complete the fabrication theory. The trial court denied this motion, however, based on the Pennsylvania Rape Shield law,[2] and allowed only the introduction of evidence that the victim resided with appellant and his wife because there was a "problem" at her mother's home. N.T. 3/29/90 at 31–33.

At trial, as is common in sexual abuse cases, the victim and the defendant provided the only direct evidence of the events at issue. The victim testified to an ongoing series of sexual abuses, which began during summer visits to Philadelphia. She recalled that after she had begun living with her aunt and appellant in June of 1987, she had engaged in a variety of sexual acts with appellant while her aunt was at work.[3] She testified that she had consented to these acts in exchange for appellant's occasional intervention in, and protection from, severe discipline which her aunt had regularly imposed upon her.[4] On one occasion, which the victim

2. 18 Pa.C.S.A. § 3104.

3. The victim testified that appellant: put his hands inside her underwear and felt her vaginal area during a "wrestling" episode, N.T., N.T. 3/29/90 at 67–69; "looked" at her while she was taking a bath, N.T. 3/29/90 at 70; and felt her breasts and got on top of her and started "grinding." N.T. 3/29/90 at 71; Trial Court Opinion at 2.

4. For example, in response to the question of whether her aunt had forced her to wash dishes, the victim responded: "[I] [w]ashed dishes,

described in graphic detail, appellant allegedly came into her room, undressed her, carried her into his room, and had oral sex with her. *See* N.T. 3/29/90 at 84–89. She testified that appellant had explained that he "wouldn't have sex[ual intercourse] with me until I was 16 ... [b]ecause I was too young." *Id.* at 100. According to the victim, the abuse ended only when, on February 17, 1989, she ran away from her aunt's home and, for the first time, reported the abuse to an adult.[5]

Appellant took the stand in his own defense, categorically denying any sexual contact with the victim. In addition, defense counsel attempted to establish, through circumstantial evidence, that the victim had fabricated the sexual abuse charges to escape her aunt's harsh discipline. In closing, the Commonwealth responded that the victim's testimony had "the ring of truth" possible only if appellant was in fact guilty of sexually abusing the victim. The jury apparently discredited appellant's fabrication theory, convicting him on both counts. Post-trial motions were filed and denied.

swept the kitchen floor, mopped the bathroom floor and the kitchen floor, vacuumed the living room, dining room, upstairs and hallway floor, the kitty litter box, and one time as I was doing that, I had to clean the whole basement. Now, don't you think that's a little too much for an eleven year old?" N.T. 3/30/90 at 34–35.

5. The victim conceded at trial that she did not avail herself of several opportunities to relay to others the fact of her sexual abuse before she ran away from her aunt's home. For example, the victim testified that although her aunt had specifically instructed her to tell her immediately if her uncle did "anything," she did not confide in her aunt because she believed her aunt was not "serious." N.T. 3/29/90 at 68. Moreover, while the victim was regularly attending therapy sessions to help her cope with her prior abuse, she testified that she did not recount the abuse to her therapist in any session before February 17, 1989, because she feared that her therapist would tell her aunt. *Id.* at 72–73. Finally, although she regularly spoke to her parents on the phone, she claimed that she did not alert them of the abuse because she was afraid her parents and her aunt would "argue" over the situation. *Id.* at 103. It should be noted that the victim testified that she had earlier recounted some of the abuse to two other children, but had admonished them to remain silent in this regard. *Id.* at 74, 101–102. At trial, however, no friend of the victim's was called to corroborate this claim.

Subsequently, appellant filed supplemental post-trial motions urging that a new trial was warranted because "after discovered evidence" established that the victim had, after appellant had been convicted, run away from the foster home where she had been placed after being removed from appellant's home, and claimed that an adult male in that home had sexually abused her as well. Appellant argued that such evidence established a "pattern" of sexual abuse fabrication to avoid discipline. On July 31, 1990, the trial court held a hearing on this matter, but denied appellant post-trial relief on the basis that such impeachment evidence could not serve as grounds for relief on an after discovered evidence claim. Appellant was thereafter sentenced to a term of five to ten years imprisonment for involuntary deviate sexual intercourse and a concurrent term of one to two years imprisonment for corruption of a minor. This timely appeal followed.

On appeal, appellant raises the following issues for our consideration:

[I.] DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION IN LIMINE SEEKING TO INTRODUCE EVIDENCE OF A PRIOR SEXUAL ASSAULT UPON THE COMPLAINANT?

[II.] DID THE DENIAL OF APPELLANT'S MOTION IN LIMINE AND MOTION FOR A MISTRIAL ALLOW THE PROSECUTOR TO COMMIT PROSECUTORIAL MISCONDUCT BY ARGUING TO THE JURY THAT THE COMPLAINANT'S YOUTH PRESUMED A LACK OF KNOWLEDGE CONCERNING HUMAN PHYSIOLOGY, SEXUAL PRACTICES AND LEGAL INTRICACIES?

[III.] WAS IT ERROR TO DENY DEFENSE COUNSEL THE OPPORTUNITY TO QUESTION APPELLANT ON REDIRECT EXAMINATION REGARDING THE COMPLAINANT'S PRIOR SEXUAL ABUSE AFTER THE COMMONWEALTH "OPENED THE DOOR" TO THAT LINE OF QUESTIONING DURING CROSS-EXAMINATION?

[IV.] DID THE COURT ERR IN PRECLUDING DE-
FENSE QUESTIONS OF THE COMPLAINANT RE-
GARDING AN ALTERNATE SOURCE OF HER SEX-
UAL KNOWLEDGE?

[V.] DID THE COURT ERR IN FAILING TO GRANT
A NEW TRIAL BASED ON AFTER–DISCOVERED
EVIDENCE SHOWING MOTIVE, INTENT OR
SCHEME ON THE PART OF THE COMPLAINANT?

Appellant's Brief at 1. Only the first issue needs to be
discussed herein.[6]

## II. RIGHT TO CONFRONTATION
## AND CROSS–EXAMINATION

■ Appellant contends that the trial court erred in ex-
cluding evidence of the victim's prior experience as a prose-
cutrix in a sexual assault case against an adult male.
Appellant argues that such evidence was relevant to and
highly probative of the defense he presented at trial, *i.e.*
that the victim had fabricated the charges in an effort to
escape from the home in which she was being severely
disciplined, in that it tended to make more likely the possi-
bility that the victim falsely accused him of sexual abuse.
Therefore, he contends, the exclusion of such evidence
denied him his constitutional rights to confrontation and
cross-examination.

In response, the Commonwealth argues that any such
evidence or line of questioning would impermissibly result
in the introduction of evidence of the victim's sexual histo-
ry, and as such, was properly precluded from trial under
Pennsylvania's Rape Shield Law. The Commonwealth sub-
mits that the exceptions to the Rape Shield Law's nearly
absolute bar of evidence of a victim's sexual experience are
extremely limited, preventing the admission of any such
evidence which does not itself exonerate the defendant.

---

6. Because the remaining alleged errors neither present novel issues of
law, nor could be repeated on retrial, we need not address them. *See
Commonwealth v. Santiago*, 405 Pa.Super. 56, 60 n. 1., 591 A.2d 1095,
1097 n. 1 (*en banc*), *allocatur denied*, 529 Pa. 633, 600 A.2d 953
(E.D.1991, Table).

Moreover, the Commonwealth urges, other admissible impeachment evidence existed which allowed appellant to exercise fully his constitutional right to confront and cross-examine witnesses against him.

The trial court determined that the prejudicial impact of the evidence of the victim's prior experience as a prosecutrix outweighed its probative value. For this reason, it excluded the evidence from trial and denied appellant's motion for a new trial. After exhaustive review of the record, the briefs and the relevant authority, we are compelled to find that the trial court erred in doing so.

The battle waged between the legislatively created Rape Shield Law and the constitutional right to confront and cross-examine witnesses is by now a familiar one in Pennsylvania. Both this Court and our Supreme Court have served as battlegrounds in this conflict many times before.[7] The task of resolving such disputes, however, remains difficult.

■ The Rape Shield Law provides in pertinent part:

**Evidence of victim's sexual conduct**

(a) **General rule.**—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and

7. *See Commonwealth v. Jorgenson,* 512 Pa. 601, 517 A.2d 1287 (1986); *Commonwealth v. Marjorana,* 503 Pa. 602, 470 A.2d 80 (1983); *Commonwealth v. Smith,* 410 Pa.Super. 363, 599 A.2d 1340 (1991); *Commonwealth v. Boyles,* 407 Pa.Super. 343, 595 A.2d 1180 (1991); *Commonwealth v. Nieves,* 399 Pa.Super. 277, 582 A.2d 341 (1990); *Commonwealth v. Frank,* 395 Pa.Super. 412, 577 A.2d 609 (1990); *Commonwealth v. Reefer,* 393 Pa.Super. 193, 573 A.2d 1153 (1990); *Commonwealth v. Johnson,* 389 Pa.Super. 184, 566 A.2d 1197 (1989) (*en banc*), *appeal granted,* 525 Pa. 643, 581 A.2d 569 (1990); *Commonwealth v. Troy,* 381 Pa.Super. 326, 553 A.2d 992 (1989) (plurality); *Commonwealth v. Poindexter,* 372 Pa.Super. 566, 539 A.2d 1341 (1988); *Commonwealth v. Lyons,* 364 Pa.Super. 620, 528 A.2d 975 (1987); *Commonwealth v. Nenninger,* 359 Pa.Super. 444, 519 A.2d 433 (1986); *Commonwealth v. Simmons,* 355 Pa.Super. 326, 513 A.2d 453 (1986); *Commonwealth v. Coia,* 342 Pa.Super. 358, 492 A.2d 1159 (1985); *Commonwealth v. Dear,* 342 Pa.Super. 191, 492 A.2d 714 (1985); *Commonwealth v. Black,* 337 Pa.Super. 548, 487 A.2d 396 (1985) (*en banc*); *Commonwealth v. Duncan,* 279 Pa.Super. 395, 421 A.2d 257 (1980).

reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3104. In contrast, the Sixth Amendment to the United States Constitution[8] ensures that:

In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor.[9]

On their face, the two authorities at issue herein may seem to share no common interests. By excluding from trial any evidence of either the victim's chastity or promiscuity, the purpose of the Rape Shield Law may be seen as simply terminating any misguided efforts of overly zealous defense attorneys who may seek to harass or embarrass the victim/witness brave enough to venture onto the witness stand. See *Commonwealth v. Smith*, 410 Pa.Super. 363, 368, 599 A.2d 1340, 1342 (1991). It has been held that the purpose of the Confrontation Clause, on the other hand, is to ensure that an accused is allowed the opportunity to challenge and to cross-examine adverse witnesses and to produce favorable witnesses in his or her defense. *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Examined more closely, however, the purposes of the two authorities may be, at least in part, reconciled. Because

**8.** These Sixth Amendment rights have been made applicable to the states through the Fourteenth Amendment Due Process Clause. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**9.** Virtually identical guarantees may be found in Pennsylvania's Constitution which provides that, "[i]n all criminal prosecutions, the accused hath a right to ... meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor." Pennsylvania Const. Article I, § 9. Although this portion of the constitution was written in 1790, a substantially similar provision existed in Clause 9 of the Declaration of Rights of the Constitution of 1776.

there exists no logical correlation between a victim's chastity or promiscuity and the likelihood that the victim was in fact raped, the introduction of such evidence can serve only to confuse or prejudice the factfinding process. *See Commonwealth v. Majorana*, 503 Pa. 602, 609, 470 A.2d 80, 83–84 (1983) ("in an enlightened age a complaining witness' prior consensual sexual activity is simply not relevant to show present consent."); *see also Commonwealth v. Reefer*, 393 Pa.Super 193, 196, 573 A.2d 1153, 1154 (1990) (testimony concerning sexual contacts not "in any way relevant" to show consent).[10] By excluding from trial evidence of the victim's past sexual conduct, the possibility of confusion and prejudice is thus minimalized. *See e.g. Commonwealth v. Johnson*, 389 Pa.Super. 184, 188, 566 A.2d 1197, 1199 (1989) (*en banc*), *appeal granted*, 525 Pa. 643, 581 A.2d 569 (1990) (holding that because evidence of prior assault, which, though non-volitional in nature, tends to embarrass a victim/witness and prejudice the jury, it is subject to exclusion by the Rape Shield Law). In this way, the Rape Shield Law aids in the factfinder's search for the truth by excluding evidence which might distract from legitimate issues involved in sexual assault cases. *See Commonwealth v. Nieves*, 399 Pa.Super. 277, 290, 582 A.2d 341, 348 (1990).

Similarly, as Chief Justice Rehnquist has most recently explained, writing for the majority in *White v. Illinois*, —— U.S. ——, ——, 112 S.Ct. 736, 743, 116 L.Ed.2d 848, —— (1992), "the Confrontation Clause has as a basic purpose the promotion of the 'integrity of the fact finding process.' " [11] It does so "by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth.' " *Dutton v.*

---

**10.** In this respect, the Rape Shield Law is merely a statutory recognition of the common law legal maxim *res inter alios acta* which "forbids the introduction of collateral facts which by their nature are incapable of affording any reasonable presumption or inference as to the principle matter in dispute...." Black's Law Dictionary, 6th Ed. *See Commonwealth v. Majorana, supra*, 503 Pa. at 83–84, 470 A.2d at 83.

**11.** *Quoting Coy v. Iowa*, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 2802, 101 L.Ed.2d 857, 866 (1988); *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631, 641 (1987).

*Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970) *(quoting California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489, 499 (1970)).[12] As the United States Supreme Court has explained,

> "[T]he twofold aim [of criminal justice] is that guilty shall not escape or innocence suffer." *Berger v. United States,* 295 U.S. [78], at 88, 55 S.Ct. [629], at 633, 79 L.Ed., at 1314 [(1935)]. We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. *The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system depends on full disclosure of all the facts, within the framework of the rules of evidence.*

*United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1064 (1974) (emphasis added).[13]

**12.** In *California v. Green, supra,* the United States Supreme Court held that, "[c]onfrontation: (1) insures that the witness will give his statement under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Id.* 399 U.S. at 158, 90 S.Ct. at 1935 (footnote omitted). *See also* Lapp, *Rape Shield Statutes: Constitutional · Despite Unconstitutional Exclusions of Evidence,* 1985 Wisconsin Law Review 1219, 1256, *(citing United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) (an accused has the right to present evidence that is relevant, material, and favorable to his defense); *Jenkins v. McKeithen,* 395 U.S. 411, 429, 89 S.Ct. 1843, 1852, 23 L.Ed.2d 404 (1969) ("The right to present evidence is, of course, essential to the fair hearing required by the Due Process Clause"); *see generally Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

**13.** *See also Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593, 600 (1975) ("The very premise of our adversary process is that partisan advocacy of both sides of a case will best provide the ultimate objective that the guilty are convicted and the innocent go free."); *Commonwealth v. Santiago, supra,* 591 A.2d at 1110 ("In our system, truth is determined through an essentially

■ The search for the truth, therefore, is a common bulwark upon which both the Rape Shield Law and the Confrontation Clause are built. Thus, in many cases, the intent of both the Rape Shield Law and the Confrontation Clause may be advanced without encroaching upon the other's domain. We must recognize that the defense attorney who kindles the "great engine of cross-examination" to harass or embarrass the victim/witness does so to conceal rather than unveil the truth. Nothing within either the terms or the history of the Confrontation Clause could in any way be interpreted to protect such misguided defense strategy, and thus the operation of the Rape Shield Law in such a case remains unhindered. This is true, in fact, whether or not an obfuscation of the truth determining process is actually intended. Even incidental prejudice may be sufficient to exclude facts from trial which bear lightly if at all on the ultimate issues without violation the Confrontation Clause, as the United States Supreme Court has most recently made clear:

"[T]he right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55, 97 L.Ed.2d 37, 107 S.Ct. 2704 [2711] (1987), *quoting Chambers v. Mississippi*, 410 U.S. 284, 295, 35 L.Ed.2d 297, 93 S.Ct. 1038 [1046] (1973). We have explained, for example, that "trial judges retain wide latitude" to limit reasonably a criminal defendant's right to cross-examine a witness "based on concerns about, among other things, *harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.*" *Delaware v. VanArsdall*, 475 U.S. 673, 679, 89 L.Ed.2d 674, 106 S.Ct. 1431 [1435] (1986).

*Michigan v. Lucas*, 500 U.S. ——, ——, 111 S.Ct. 1743, 1746, 114 L.Ed.2d 205, 212 (1991) (emphasis added) (holding that Michigan Rape Shield statute, insofar as it authorizes

adversarial process," the success of which "is entirely contingent upon the availability of evidence from which the parties may base their arguments.").

614

admission of evidence of past sexual conduct only upon ten day notice, not *per se* violative of the Sixth Amendment).

█ It is only where the truth determining process is not forwarded by the exclusion of past sexual history that the Rape Shield Law and the Confrontation Clause may not be reconciled. Under these relatively rare circumstances, as this Court has previously recognized, "Rape Shield laws, if rigidly construed, could impermissibly encroach upon a defendant's right to confront and cross-examine witnesses which is secured by the United States and Pennsylvania Constitutions." *Commonwealth v. Nieves, supra,* 399 Pa.Superior Ct. at 287, 582 A.2d at 346. In such rare cases "the Rape Shield Law must bow to the need to permit an accused an opportunity to present genuinely exculpatory evidence...." *Id.*

█ The difficulty is of course in determining when the truth determining process is sufficiently affected by the application of the Rape Shield Law. In Pennsylvania, we have come to resolve this question through a relatively elaborate procedure which is designed to ensure that no evidence of the victim's sexual history is introduced *unless* and *until* it can be established that to exclude such evidence would lay victim to the very raison d'etre of the trial itself: the pursuit of truth. The process begins with the defendant submitting a *specific* proffer to the court of exactly what evidence he or she seeks to admit and precisely why it is relevant to the defense. *See Commonwealth v. Smith, supra,* 410 Pa.Superior Ct. at 368–369, 599 A.2d at 1342; *Commonwealth v. Nieves, supra,* 399 Pa.Superior Ct. at 288, 582 A.2d at 347. This procedure forces the defendant to frame the precise issues and interests involved, and prevents him or her from embarking upon "fishing expedition style intrusions on Rape Shield law protections." *Id.,* 399 Pa.Superior Ct. at 292, 582 A.2d at 349. Where the proffer is but vague and conjectural, evidence of the victim's past sexual conduct will be excluded and no further inquiry need be entertained. *Id.; Common-*

*wealth v. Troy,* 381 Pa.Super. 326, 335, 553 A.2d 992, 996–97 (1989) (plurality).

 Where the proffer is sufficiently specific, the court must then undertake a three part analysis of the substance of the proffer. At the trial level, the court must conduct an *in camera* hearing at which they must determine: 1) whether the proffered evidence is *relevant* to the defense at trial; 2) whether the proffered evidence is *cumulative* of evidence otherwise admissible at trial; and 3) whether the proffered evidence is more probative than prejudicial. *Commonwealth v. Smith, supra,* 410 Pa.Superior Ct. at 371, 599 A.2d at 1344; *Commonwealth v. Nieves, supra,* 399 Pa.Superior Ct. at 290, 582 A.2d at 347; *Commonwealth v. Black,* 337 Pa.Super. 548, 557–58, 487 A.2d 396, 401 (1985) (*en banc*). On appeal, such evidentiary rulings must be offered due deference and overturned only where there has been an abuse of discretion. *Commonwealth v. Johnson, supra,* 389 Pa.Superior Ct. at 193, 566 A.2d at 1201. Where, however, the proffered evidence excluded by the Rape Shield law is relevant, non-cumulative, and more probative of the defense than prejudicial, it must be admitted. *Commonwealth v. Black, supra,* 337 Pa.Superior Ct. at 557–558, 487 A.2d at 401, 402.

To properly assess the merits of appellant's claim herein, we must embark upon this examination ourselves.

## A. SPECIFICITY OF THE PROFFER

Instantly, defense counsel proffered specific and uncontested evidence that the victim had prior experience as a prosecutrix in the sexual assault prosecution of her mother's adult male paramour and that the success of that prosecution caused the victim's removal from her mother's home and placement in the home in which her aunt and appellant later served as her guardians. N.T. 2/2/90 at 2–3. Counsel argued that, in view of the fact that there existed other uncontested evidence that the victim was very unhappy living with her aunt and had especially despised the corporal punishment to which she had been subjected, the evidence of her prior experience was relevant and absolutely necessary to establish that the victim may have fabricated a claim of *sexual abuse* against her *uncle* rather than fabricating a (perhaps more logical) claim of *physical*

*abuse* against her *aunt,* to escape her aunt's harsh discipline. *Id.* at 3–19. In view of the irrefutable specificity of the proffer and the uncontested existence of the evidence to which it referred, we find this proffer to be sufficiently specific. *Compare Commonwealth v. Smith, supra* (vague general proffer regarding victim's credibility not sufficiently specific); *Commonwealth v. Nieves, supra,* 399 Pa.Superior Ct. at 293, 582 A.2d at 349 (appellant conceded that he had "no idea of whether any relevant evidence would be secured by his proposed inquiry."); *Commonwealth v. Troy, supra,* 381 Pa.Superior Ct. at 335, 553 A.2d at 997 (where proffer was "made in a vacuum" without delineating *specific* evidence, remand for further inquiry was unwarranted).

### B. RELEVANCE OF THE PROFFER TO THE DEFENSE

As stated most recently, "[e]vidence is relevant if it 'logically tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact.'" *Commonwealth v. Smith, supra,* 410 Pa.Superior Ct. at 371, 599 A.2d at 1344 (quoting *Commonwealth v. Davis,* 381 Pa.Super. 483, 491, 554 A.2d 104, 108 (1989)). This Court has not hesitated in the past to conclude that evidence which does not comport with this standard, may not serve as a basis to set aside the Rape Shield Law. *See Commonwealth v. Troy, supra,* (proffered testimony of evidence that the victim stated she had previously been raped *irrelevant* to alibi defense); *Commonwealth v. Coia,* 342 Pa.Super. 358, 361, 492 A.2d 1159, 1161 (1985) (proffered testimony that victim had made repeated and unbelievable claims of sexual attacks upon herself by others and may have engaged in a course of conduct evidencing consent to sexual relations with appellant *irrelevant* to alibi defense).

There exist, of course, circumstances under which evidence of a victim/witness' sexual past may tend to prove or disprove a material fact in issue. For example, in *Com-*

*monwealth v. Majorana, supra,* the defendant had made a specific proffer to elicit through the testimony of an identified third person that the semen in the victim's body, which had been offered as evidence to corroborate the victim's testimony that the defendant had raped her, had actually come from a separate source. *Id.,* 503 Pa. at 605, 611, 470 A.2d at 81, 84. There, our Supreme Court construed the Pennsylvania Rape Shield law to intend to exclude only irrelevant and abusive inquiries, and not to exclude inquiries regarding relevant evidence which would tend to disprove the allegation. *Id.,* 503 Pa. at 611, 470 A.2d at 84. Accordingly, the Court concluded that, "[e]vidence of acts of intercourse which show that they, and not a rape, caused objective signs of intercourse is relevant." *Id.,* 503 Pa. at 605, 470 A.2d at 81.

The oft cited and relied upon *en banc* decision of this Court, *Commonwealth v. Black, supra,* offers another and more germaine example of circumstances under which evidence of prior sexual history is considered relevant at trial. In that case, the defendant proffered evidence which tended to prove that the victim might have fabricated the sexual abuse claim against the defendant. Relying on *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974),[14] this Court determined that it was a violation of a

14. Presented with the highly analogous question of whether the application of a state statute flatly prohibiting evidence of a witness' juvenile record violated the Sixth Amendment, the Supreme Court in *Davis v. Alaska* stated:

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, ... the cross-examination has traditionally been allowed to impeach, i.e., discredit, the witness.... [One] attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore Evidence § 940, p. 775. We have recognized that the exposure of a witness' motivation in testifying is a proper

defendant's constitutional right of confrontation and cross-examination "to exclude [under Pennsylvania's Rape Shield Law] relevant evidence showing witness' bias or attacking credibility." *Commonwealth v. Black, supra,* 337 Pa.Superior Ct. at 558, 487 A.2d at 401; *see also Commonwealth v. Johnson, supra,* 389 Pa.Superior Ct. at 195–196, 566 A.2d at 1202 (reaffirming the principle that evidence of the potential bias of the witness which, because of the logical nexus between the prior sexual activity and the testimony to be presented, would be exculpatory of a defendant, implicates the defendant's right of confrontation and must be admitted).[15] In *Black,* the defense had specifically prof-

and important function of the constitutionally protected right of cross-examination.

$$* \quad * \quad * \quad * \quad * \quad *$$

We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. Here, however, petitioner sought to introduce evidence of Green's probation for the purpose of suggesting that Green was biased and, therefore, that his testimony was either not to be believed in his identification of petitioner or at least very carefully considered in that light. Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record—if the prosecution insisted on using him to make its case—is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.

*Davis v. Alaska,* 415 U.S. at 315–17, 319, 94 S.Ct. at 1109–1111, 1112, 39 L.Ed.2d 347, 353–54, 355.

**15.** Insofar as the prosecution owns the burden of proof in criminal cases, the partiality of witnesses for the prosecution is always considered relevant for the purposes of the Sixth Amendment, as the weight of the testimony is a crucial aspect in the prosecution's effort to overcome the presumption of innocence. *See Davis v. Alaska,* 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354. Indeed, the United States Supreme Court cogently summarized this sentiment more than thirty years ago:

Certain principles have remained relatively immutable in our jurisprudence. One of the these it that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, *it is even more important where the*

fered evidence of the victim's consensual sexual relationship with her brother and argued that it was relevant to show a motive to fabricate the sexual abuse charges brought by the victim against her father. In view of the fact that there existed record evidence that the victim's sexual complaints coincided with violent arguments between appellant and the victim's brother, which eventually culminated in the brother leaving home and separating from the family, the *Black* court determined that the proffer was a "telling factor in understanding where [the victim's] allegiance lay," and thus was relevant to show "a specific bias against and hostility toward appellant [the father] and a motive to seek retribution by, perhaps, false accusation." *Id.*, 337 Pa.Superior Ct. at 548, 487 A.2d at 396.[16]

> evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination....
>
> *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377, 1390–91 (1959) (emphasis added).

**16.** We should note that some panels of this Court have construed the *en banc Black* holding to apply in only those cases where "the victim's credibility was allegedly affected by bias against or hostility toward *the defendant. See e.g. Commonwealth v. Smith, supra,* 410 Pa.Superior Ct. at 371, 599 A.2d at 1343; *Commonwealth v. Boyles, supra,* 407 Pa.Superior Ct. at ——, 595 A.2d at 1186; *Commonwealth v. Reefer, supra,* 393 Pa.Superior Ct. at 196, 573 A.2d at 1154; *Commonwealth v. Coia, supra.* In most of these cases, however, this Court was not presented with the question of whether evidence of the complainant's sexual past could be admitted to establish that the complainant may have fabricated a claim against the defendant because of a bias or hostility toward a third party, *i.e.* that the defendant was used as a pawn by the complainant. *See Commonwealth v. Boyles, supra* (defense sought to introduce evidence of victim's past sexual allegations to prove *consent* ); *Commonwealth v. Reefer, supra* (defense sought to introduce evidence that other persons had sexual contact with minor victim for undisclosed reasons); *Commonwealth v. Coia, supra* (defense sought to introduce evidence that victim had previously made unbelievable claims of sexual abuse and had engaged in conduct evidencing consent to sex with defendant); *but see Commonwealth v. Smith, supra* (defense proffered evidence that rape claim was fabricated against defendant out of fear of discipline by third party). To the extent that such cases purport to limit the *Black* ruling by exceeding the facts presented, they must be considered *obiter dicta.*

To the extent that **such** language limiting *Black* may not be **properly so** characterized **as dicta,** we note the following. Whether the accused is the target of, or merely a pawn in, a fabrication scheme does

To determine the relevance of appellant's proffer to his defense of fabrication herein, we must examine carefully the evidence adduced at trial. On cross-examination, the victim freely admitted that she wanted to return to her mother's house to escape her aunt's discipline, which she thought too severe. N.T. 3/30/90 at 33. On direct examination, the victim's aunt and appellant each corroborated this testimony by conceding that in response to various disciplinary problems involving the victim,[17] the victim's aunt had often imposed corporal punishment and appellant had occasionally intervened on the victim's behalf in this regard. N.T. 4/3/90 at 26, 134–137.

The victim's displeasure with her aunt was corroborated in other ways as well. Before alleging that she had been sexually abused on February 17, 1989, the victim had re-

not matter. Evidence that a complaint has been fabricated, for *whatever* reason, is always "exculpatory" to the defendant. *See Black's Law Dictionary,* 6th Ed. (defining "exculpatory" as "clearing or tending to clear from alleged fault or guilt; excusing."). Consistent with our interpretation of limitations on the Application of the Rape Shield Law herein, an *en banc* panel of this Court recently held, "that the Rape Shield Law is a bar to admission of testimony of prior sexual conduct involving a victim, whether it is consensual or the result of nonconsensual or assaultive behavior, *unless* it *has probative value which is exculpatory to the defendant." Commonwealth v. Johnson, supra,* 389 Pa.Superior Ct. at 195–196, 566 A.2d at 1202; *see also Commonwealth v. Nieves, supra,* 399 Pa.Superior Ct. at 292, 582 A.2d at 348. The limitations placed on the *Black* holding in language used by several panels of this Court would, of course, exclude **exculpatory** evidence which established, however conclusively, that the accused had been used as a pawn, since the such evidence would not tend to show bias or hostility *toward the defendant per se,* **but rather, perhaps, toward another.** To this extent, therefore, these rulings must be seen to conflict with an *en banc* panel's decision in this Court. Accordingly, we decline to follow them herein. *See Commonwealth v. Smith, supra,* 410 Pa.Superior Ct. at 373, 599 A.2d at 1346 (Del Sole, J., dissenting).

**17.** The victim's aunt related specific problems for which the victim was punished such as: the victim had taken her aunt's diamond ring to school to show her friend and denied having done so, despite her teacher's report to the victim's aunt that the teacher had seen the ring, N.T. 4/3/90 at 28–29; the victim had forged her aunt's signature on weekly reports, report cards and other papers sent home from school. *Id.* at 29. The trial court, however, refused to admit evidence as to the precise nature of the problem for which the victim was to be punished on the day the victim first complained that she had been sexually abused. *See infra* note 18.

peatedly complained to her cousin about living with her aunt, N.T. 4/2/90 at 5–7; N.T. 3/30/90 at 78, and she had requested that she be allowed to live in another home. N.T. 3/30/90 at 33.

Eventually, appellant's defense theory went, the victim's unhappiness with her aunt became too much to bear. This theory was not without support. The victim testified that earlier on the day she first reported the sexual abuse, her teacher had contacted her aunt regarding a report that she had cut the hair of some of the girls in school to use in performing "witchcraft." N.T. 3/29/90 at 109–116; 4/3/90, p. 36–39.[18] The victim testified that, after speaking with her aunt on the phone that afternoon, she realized that she might be severely disciplined for her conduct. To protect herself from such discipline, the victim explained, she took a butcher knife from the kitchen, and put it under a blanket in her bedroom and called the police. N.T. 3/29/90 at 110. She testified that she told the police that she was in trouble "for no reason at all," that her "aunt was always beating me for the littlest things," and that she was "scared" of her aunt returning home. *Id.* at 111–112. According to the victim, the police responded by suggesting that if she would tell her aunt that she had called the police, her aunt

18. The victim testified that the other students had agreed to let her "borrow" their hair for the "witchcraft" and that "they pulled a little bit, like two or three strands out, and they gave it to me, and I taped it on the paper." N.T. 3/29/90 at 108. The defense attempted to impeach the victim in this regard by calling the victim's teacher to testify that students in the class had complained that the victim had cut their hair with a *razor.* N.T. 4/2/90 at 61. The court ruled that such testimony was inadmissible hearsay. *Id.* at 62. The defense then offered to limit the testimony to only the fact that the teacher had actually seen that the other students' hair had been in fact cut (*i.e.* not simply pulled out as the victim had testified). The trial court then ruled that the issue was irrelevant. *Id.* at 63. When asked by defense counsel thereafter if the court was "restricting me from bringing in any of the incidents where [the victim] lied," the court responded, "That's right, definitely." *Id.* Ultimately, the teacher was restricted to testifying only that she had in fact called the victim's mother that day, but was precluded from describing the "nature of the incident." *Id.* at 79.

"wouldn't be so mad." *Id.* at 111.[19] The police were apparently wrong.

The victim's aunt testified that when she returned from work later that afternoon, she and appellant confronted the victim about the problem at school and the victim "asked if she could go home [to her mother's house in Detroit]." N.T. 4/3/90 at 37. When the victim's aunt told her that her mother wanted her to remain at her aunt's house until she turned sixteen, the victim informed her aunt and appellant that she had called the police. N.T. 3/29/90 at 113–114; N.T. 4/3/90 at 36–37. Rather than diffusing the aunt's anger, knowledge of this fact caused tensions to escalate. At this point, the victim's aunt ordered the victim upstairs to her room and followed to discipline her with a belt.

Then, according to both the victim and her aunt, once the victim's aunt entered the victim's bedroom, the victim pulled the knife from under the blanket. N.T. 3/29/90 at 114–115; 4/3/90 at 38–40. The victim testified that she "pointed it [the knife] at her [aunt], and was getting ready to stab her," N.T. 3/29/90 at 114–115; 4/3/90 at 38–40, when her aunt "tried to push the knife out of my hand. But I didn't let go of the knife, and I ran downstairs, and she told Jerome [appellant] to stop me, and then I turned around quick, and he saw the knife in my hands, and he jumped back, and I left out the door." N.T. 3/29/90 at 115.

Further testimony revealed that once outside, the victim encountered a schoolmate who had seen her running with the knife. When asked by her schoolmate what was wrong, the victim did not mention any sexual abuse. *Id.* at 117. Rather, the first claim of sexual abuse was heard shortly thereafter by her schoolmate's mother, a police officer whom the victim knew from school. At roughly the same time, the victim's aunt testified, a note from the victim was found in her room which read: "You think teachers are

19. The victim also testified that the police officer on the phone gave her a "child-abuse hotline" number to call, which she did. N.T. 3/29/90 at 112. She was told by those at that number, "Well, if anything happens when she gets home, then call us back." *Id.* at 113.

always right. I don't have a razor. You never listen to me, and it's all your fault that I had to do this." N.T. 4/3/90 at 40–41, exhibit D–1.[20]

Certainly the fact that the victim's first claim of sexual abuse fell on the heels of a violent argument supports the fabrication theory. *See Commonwealth v. Black, supra* (where victim's allegations of sexual abuse surfaced at the same time that violent argument was occurring between the victim's father and her brother, evidence of the victim's consensual incestual relationship with brother was relevant to show victim's likelihood of fabricating sexual abuse claim against father). The fact that the victim's aunt allegedly found a note in the victim's room which suggested her desperation and willingness to do something drastic was unquestionably helpful for the defense as well.

Conspicuously absent from the defense theory, however, is any evidence to explain why the victim might have employed a false *sexual abuse* claim against her *uncle* as a means to accomplish this motive. After all, it was her *aunt* who had disciplined her. Why the victim might have shifted her hostility toward appellant, who by all accounts, had often protected the victim from her aunt, is left unexplained by the evidence at trial. Indeed, the jury was given no reason to infer that the child victim would have falsely accused appellant of *anything,* much less *sexual abuse,* a crime of which twelve year old children often know little. Why then, the jurors may have pondered, would the victim have accused her uncle of sexual abuse, *unless he really did it?*

Without the excluded evidence, the defense was powerless to allay any such possible concerns. The evidence admitted at trial simply did not address such aspects of the defense theory. The jury was apparently asked merely to ignore the obvious logical leap.

**20.** Although the victim admitted to having written the note, she denied having written the last sentence of it. N.T. 3/29/90 at 115, 126–27. No handwriting exemplars were apparently taken.

Here, the excluded evidence established that the victim had, three years before this charge, alleged that her mother's paramour had sexually molested her. This, in and of itself, is not significant. Far more important, however, is the fact that the proffer also established that the victim participated in the *successful* prosecution of her former abuser, and that participation ultimately lead to her *removal from her mother's house.* From this, the jury could have inferred that the victim had, at the time she alleged that appellant had sexually abused her, labored under the impression that the making of another sexual abuse claim could result in her removal from her aunt and uncle's house. The victim's peculiar knowledge of the content and of the potential consequences of a sexual abuse claim was thus relevant to establish why the victim might have chosen to fabricate a specific *type* of claim, one of sexual abuse against an adult male in the house in which she lived and wanted to leave. *See Cohen v. Albert Einstein Medical Center,* 405 Pa.Super. 392, 401, 592 A.2d 720, 725 (1991) (evidence of "Munchausen's Syndrome," relevant to show possibility of fabricating unusual illness known as "wrist-drop" where syndrome tended to show "repeated fabrication of illness, usually acute, dramatic and convincing."); *People v. Nelson,* 92 Ill.App.3d 35, 42, 47 Ill.Dec. 683, 690, 415 N.E.2d 688, 695 (1981) (evidence of defendant's peculiar knowledge of then obscure defense known as "dissociative reaction" from the book *Anatomy of a Murder, relevant* to show means of fabricating the defense at trial). Given the timing of the victim's allegations of sexual abuse, *i.e.* immediately after a violent argument with her aunt which was prompted in part by the victim's unsuccessful attempt seek police protection from her aunt's discipline, we conclude that the excluded evidence showing why the victim might have fabricated a claim of sexual abuse against her uncle, was relevant to appellant's defense. *See Commonwealth v. Black, supra.*

Contrary to the Commonwealth's position on appeal, we find nothing in this result inconsistent with that reached in

*Commonwealth v. Appenzeller*, 388 Pa.Super. 172, 565 A.2d 170 (1989) (*en banc*). There, this Court was presented with the question of whether evidence of a prior sexual assault was admissible to show a child victim's knowledge of sexual techniques and nomenclature. The *Appenzeller* Court reasoned that because the credibility of the victim was never made an issue at trial, and because no "foundation" was laid for the relevance of the proffer, *i.e.* by establishing that the victim could not have otherwise acquired such knowledge, the testimony concerning a prior assault on the victim was irrelevant to and inadmissible at trial. *Id.*, 388 Pa.Superior Ct. at 176–177, 565 A.2d at 172. Such is not the case herein.

Here, unlike in *Appenzeller*, the victim's credibility was the crucial issue for the defense. Other than his own specific denials, appellant relied solely upon his theory that the victim had fabricated the claims of sexual abuse. No other defense was offered.

Moreover, the "foundation" for the relevance of the proffered evidence here was properly laid. In *Appenzeller*, the evidence of the victim's prior assault was offered to show her knowledge of *sexual terms* only. The *Appenzeller* Court determined that the victim might have otherwise been aware of such facts, especially in view of the fact that the record revealed that she spent unsupervised time with older children. Here, the evidence of the victim's prior participation in the *successful prosecution* of an adult male which led to her removal from the home in which she had been molested was offered to show that the victim was aware of both the content and the *consequences* of making a sexual abuse claim against an adult male. There was no otherwise admissible evidence which suggested that the child victim might otherwise have had reason to believe that a claim of sexual abuse against an adult male might secure her removal from her aunt's house. Indeed, the Commonwealth argued as much in its closing.[21] *Appenzeller*, is

21. The Commonwealth argued:

What else has the ring of truth? As I told you, her saying that Jerome Wall would say to her, "I am not going to have regular sex with you, you're too young," that has the ring of truth.

*How in the world would a 12– or 11–year–old child know that kind of thing to say that he said to her unless he actually said it to her?*

Also, the statement, "Do you want me?" and her saying yes, again, these are things that an adult says to a child when they're trying to convince or conjole the child to have sex. The ring of truth, ladies and gentlemen of this jury.

 \* \* \* \* \* \*

This child didn't want to leave this home. She didn't want to go to a foster care again. She hung in there, even while she was being physically, or, rather, sexually abused by the uncle, and even though she is being beat, she hung in there, because she had nowhere else to go, and wanted to be with her family, the only family she had, and her aunt knew that.

Her aunt knew that. This motive to lie makes no sense at all, because she wanted to be with her family.

*Also, ladies and gentlemen, counsel is trying to make you think that this little eleven- or twelve-year-old girl knew all the intricacies of law and knew, well, if she made a point of going down and telling X, Y, and Z, that there would be a court hearing, and that she would get out of that house.*

A 12–year–old, you know from common sense, she is not old enough to think that way. That is a more calculated away like adults who are trying to make this little kid into an adult for you. She is not an adult. She is not that calculated in her thinking. She *couldn't know—she told you she didn't know what was going to happen.*

 \* \* \* \* \* \*

She indicated that he would have her bite his nipples, and he would tell her to bite them harder. How would a child of ten or eleven know that that kind of thing brings an adult male sexual pleasure?

Again, it makes sense. It has the ring of truth. She also indicated to you that he used to have her suck his penis or his private part, and that the white stuff would squirt out.

And what did she say about that? Again, the ring of truth, that this stuff would sometimes go on her, and she would go to the bathroom and wipe it off. Or it would go on the bed, and the defendant would wipe it up. Now, why did he wipe it off?—Again, the ring of truth—because he didn't want his wife coming home and seeing a sperm stain on the bed clothes. So you better believe he wiped it off. Again, the ring of truth in this child's description.

What else did she say? She indicated to you that he used to put his hand on her head and move her back and forth on his penis— again, the ring of truth. *This is a twelve-year-old child saying these things.*

N.T. 4/3/90 at 202–203, 20–206, 213 (emphasis added). We note that to the extent the Commonwealth sought to draw an adverse inference from the absence of evidence it successfully *excluded* from trial, such argument was error. *See Commonwealth v. Tumpson,* 242 Pa.Super.

therefore materially distinguishable from this case.[22]

## C. CUMULATIVE NATURE OF THE PROFFER

The Commonwealth next argues that the evidence of the victim's experience as a prosecutrix was cumulative to the defense of fabrication, since

the record was replete with other evidence impeaching the victim, including her fifth grade teacher's testimony that the victim had a reputation for lying at school; the discrepancies between what she initially told Officer Elliot Feldman of the Sex Crimes Unit [the first police officer to interview the victim after she had alleged sexual abuse of appellant] about the specific sexual acts committed by her uncle and her trial testimony detailing these sexual assaults; and her delay in reporting any of these incidents to any person, despite her frequent visits to a therapist and the availability of a school counselor.

*Commonwealth's Brief at 5.* We cannot agree.

While it is true that other evidence was available to challenge the credibility of the victim, none of the admitted

1, 6, 363 A.2d 1129, 1132 (1976) (prosecutor's attempt to exploit absence of witness known to exist but unavailable, was a "deliberate attempt to mislead the jury" and constituted reversible error where no curative instruction was given by trial court); *see also Commonwealth v. Wright,* 255 Pa.Super. 512, 388 A.2d 1084 (1978) (improper to argue inferences from the absence of evidence where such absence was not established at trial); *see generally Commonwealth v. Toth,* 455 Pa. 154, 158, 314 A.2d 275, 278 (1974) (" 'The district attorney is a quasi-judicial officer ... [who] should present the Commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate.' ") (quoting *Commonwealth v. Nicely,* 130 Pa. 261, 18 A. 737 (1889).

**22.** We note additionally that the Commonwealth's reliance on *Commonwealth v. Boyles,* 407 Pa.Super. 343, 595 A.2d 1180 (1991), for the proposition that a victim's credibility may not be determined by her prior non-consensual sexual experiences, is also misplaced. In *Boyles* this Court pointed out that, although appellant's asserted purpose in offering evidence of the victim's two prior allegations of sexual assault was to impeach her credibility, "he was primarily seeking to buttress his claim of *consent." Id.* (our emphasis). Here, the evidence was neither being ostensibly nor realistically offered to support a consent defense since none was offered. Accordingly, the *Boyles* case is distinguishable as well.

impeachment evidence suggested any reason for the victim to direct her hostilities toward appellant, nor did it offer any reason to believe any such hostilities would manifest themselves in a claim of sexual abuse. As we have previously stated, this aspect of appellant's defense was crucial. We cannot say, therefore, that any of the existing evidence which subjected the victim's credibility to question was cumulative of the evidence regarding the victim's prior experience as a prosecutrix.

### D. PREJUDICIAL VERSUS PROBATIVE VALUE

To be deemed admissible, the proffer's probative value must outweigh the prejudice which may result from its admission. *Commonwealth v. Nieves, supra,* 399 Pa.Superior Ct. at 288, 582 A.2d at 347; *Commonwealth v. Black, supra,* 337 Pa.Superior Ct. at 558, 487 A.2d at 401. Even logically relevant evidence which, under the circumstances of a given case, is more prejudicial than probative, may be excluded without violating a defendant's right to confrontation and cross-examination. *See Michigan v. Lucas, supra.*

The leading case on this issue in Pennsylvania offers guidance herein. In *Commonwealth v. Johnson, supra,* this Court, sitting *en banc,* was faced with the question of whether evidence of a prior sexual assault, which would be barred by the application of the Rape Shield Law, was nonetheless sufficiently probative of the defense of fabrication to be introduced. There, the Commonwealth produced the eyewitness' testimony of a twelve year old child who lived in the ten year old victim's neighborhood. The eyewitness claimed to have caught the victim and the nineteen year old defendant while the defendant was molesting her. *Id.,* 389 Pa.Superior Ct. at ——, 566 A.2d at 1198.

The defendant in *Johnson* sought to bring in hearsay evidence which established that the eyewitness had previously assaulted the victim. The defendant argued that such evidence tended to show that the eyewitness had molested the victim again, and was "shifting the blame" to the defendant by "circulating the story about [the defendant]

being the assailant" and intimidating the victim into not telling the truth. *Id.,* 389 Pa.Superior Ct. at 193–196, 566 A.2d at 1201, 1202.

In examining the merits of the defendant's claim, the *Johnson* Court first articulated the potential for prejudice inherent in the introduction of evidence regarding a prior assault:

[T]here is ... a persistent belief among some people that a woman or girl would not be assaulted unless she provoked the assault by acting promiscuously or deliberately placed herself in a situation where an assault could be anticipated. This is particularly so when the parties are known to each other. We have not yet completely disabused the public mind of the perception that an assault victim is somehow to blame for the assault, and this is even more so with child victims who, due to naivete or poor supervision, find themselves unprotected and dangerously vulnerable.

*Johnson, supra,* 389 Pa.Superior Ct. at 189, 566 A.2d at 1199. In view of such potential for prejudice, the *Johnson* court carefully scrutinized the probative value of the defendant's proffer. The *Johnson* Court noted that the Commonwealth supported their case not only with the wholly consistent testimony of the victim and an eyewitness, but also with, *inter alia,* physical evidence derived from a hospital examination conducted almost immediately after the assault which confirmed that sexual penetration had occurred and physical evidence of grass and leaves in the victim's hair which corroborated the reports of several witnesses. The *Johnson* Court also considered the fact that the sexual history sought to be introduced was hearsay and in dispute as both the victim and the eyewitness denied at trial ever having any sexual contact with each other. Finally, the Court noted that the fabrication theory was flawed in that there was little reason to believe that the ten year old victim would be intimidated into falsely accusing the defendant by the twelve year old eyewitness, since the nineteen year old defendant, whom she had testified against in court, was "an older, bigger and presumably more threatening person." *Id.,* 389 Pa.Superior Ct. at 195, 566 A.2d at 1202. Under

these circumstances, the *Johnson* Court determined that the trial court had not erred in considering the evidence insufficiently probative to overcome the attendant prejudice. *Id.*

In comparing the facts of *Johnson* with those *sub judice*, we must first recognize that the excluded evidence here, to the same extent as that in *Johnson*, carries with it a possibility for prejudice. We cannot deny that, although the excluded evidence implicated the victim in conduct which was purely non-volitional in nature, it was certainly possible for the members of the jury to improperly and impermissibly infer that the victim in some sense provoked sexual abuse through her own conduct. To this extent, we find *Johnson* indistinguishable.

The probative value of the excluded evidence in the respective cases, however, differs greatly. In *Johnson*, the victim's testimony of the abuse was corroborated in several ways through physical and testimonial evidence. Here, however, the victim's testimony was left wholly uncorroborated; thus, her credibility was more determinative. Moreover, the excluded evidence of the past sexual history was not contested here. Indeed, it is an undisputed matter of record.[23] Therefore, the risk of confusing the jury with contested facts is not present herein, as it was in *Johnson.* Finally, and most importantly, the excluded evidence herein was directly linked to existing, uncontroverted evidence which would tend to show that the victim might have fabricated the sexual abuse allegations. The victim here freely admitted that she hated her aunt's harsh discipline and wanted to return home to her mother in Detroit, Michigan. On the day that the victim first made the allegations of sexual abuse against appellant, she expected to be severely physically punished and had, in effect, sought to protect herself from such discipline by telephoning the police and accusing *her aunt* of *physical* abuse. When that proved fruitless, the victim, *by her own testimony,* ultimately resorted to the use of a butcher knife to escape

23. *See* N.T. 3/29/90 at 31.

from the physical discipline. The refuge found through such drastic means would likely have been only temporary. As we have previously determined, evidence establishing how the victim might have chosen to secure more *permanent* asylum from her aunt's discipline was relevant to the defense theory of fabrication. Given the timing of the victim's sexual abuse complaint, and the fact that, according to the victim's aunt, the victim left a note to explain why she had "to do this," we conclude that the excluded evidence here was, unlike that in *Johnson*, absolutely critical to the defense. If believed, the evidence would indeed have been exculpatory to the defendant. Under the circumstances of this case we conclude that the probative value outweighed the possibility of prejudice and that, therefore, the trial court erred in excluding it from trial.[24]

**24.** We note that unlike the trial court, we find this result perfectly consistent with that reached in *Commonwealth v. Poindexter*, 372 Pa.Super. 566, 539 A.2d 1341 (1988). In *Poindexter*, this Court was presented with the question of whether the trial court erred in refusing to permit the accused to inquire as to the level of intimacy involved in the complainant's relationship with her boyfriend. There, the appellant, relying on *Commonwealth v. Black, supra,* argued that the testimony was necessary to show that the victim was motivated to press charges against appellant, her father, because of domestic difficulties arising from her relationship with her boyfriend of which her father did not approve, and which he had sought to terminate by filing charges against her boyfriend. Writing for the majority, Judge Olszewski distinguished the result in *Black, supra,* reasoning that "what was relevant was that appellant had filed charges against [the victim's] boyfriend, from which the jury could have inferred that the victim was pressing the instant charges against appellant in retaliation; this, defense counsel was allowed to argue and show." *Commonwealth v. Poindexter*, 372 Pa.Superior Ct. at 573, 539 A.2d at 1344. Thus, the Court concluded that no error was committed in excluding the evidence because it "had little probative value and was highly prejudicial." *Id.*

The proffered evidence in *Poindexter* was offered merely to show *motive* to fabricate the charges. As the *Poindexter* Court made clear, however, other evidence which *was admitted* at trial established the motive to fabricate. Evidence of the victim's sexual relationship with her boyfriend was properly found to add little, if anything, to the defense theory.

We apply the same analysis herein. Here, however, unlike in *Poindexter*, the excluded evidence was offered to buttress the evidence of *motive* to fabricate, which was already in evidence, by establishing the *particular type of fabrication* the victim might have perpetrated on the court. Given the circumstances previously described under which

### E. CONCLUSION

In sum we find that in light of the evidence that the victim wanted to leave her aunt's home and harsh discipline, the specific proffer of uncontested evidence that the victim had been previously removed from a home in which she had successfully alleged that she had been sexually abused was relevant, non-cumulative and more probative than prejudicial. To have excluded such evidence, under these peculiar circumstances,[25] was to frustrate the truth-determining process by preventing consideration of exculpatory evidence to the defense.

On remand, it must be for the members of the jury to decide the degree to which, if at all, they believe the evidence in question tends to exonerate appellant on the charges. For us, it is sufficient to say that we believe the constitutional right to confrontation and cross-examination demands that they be given such an opportunity.

Judgment of sentence reversed. Case remanded for a new trial in accordance with this decision. Jurisdiction relinquished.

OLSZEWSKI, J., filed a dissenting statement.

OLSZEWSKI, Judge, dissenting.

I fail to find an abuse of the trial court's discretion and, therefore, respectfully dissent from the majority's reversal and remand for a new trial. I believe that evidence of the child's victimization by her mother's paramour and the

this evidence was to be introduced, it added greatly to the defense theory. The facts of *Commonwealth v. Poindexter* thus differ substantially with that of the instant case. Accordingly, we properly reach a different result.

25. We emphasize that our ruling should not be seen to in any way endorse attempts to introduce evidence simply that the complainant is a "serial victim." The mere fact that a complainant has been previously victimized is itself wholly irrelevant. We hold only that where, as here, otherwise admissible facts render evidence of previous participation in a materially similar prior prosecution genuinely exculpatory, such facts may not be excluded from trial.

ultimate conviction of the assailant is irrelevant to this case and was properly excluded by the trial court.

It is difficult enough for victims of sexual assault to relive the traumatic events of the assault which is being prosecuted. To force a victim to recount an assault for which a separate perpetrator has already been tried and convicted would discourage serial victims from bringing forth allegations. One of the purposes of the Rape Shield Law may be to protect against "overly zealous defense attorneys," as the majority points out, but it was also enacted to limit evidence to that which is relevant to the assault being tried.

I believe this case is indistinguishable from *Commonwealth v. Poindexter*, 372 Pa.Super. 566, 539 A.2d 1341 (1988), in which this Court rejected appellant/defendant's attempt to introduce evidence of the victim's sexual history as relevant to the victim's motive for bringing charges against her assailant. What the appellant in this case wanted to prove was that the child had a poor relationship with her aunt and that she fabricated the charges because she wanted to be removed from the aunt's household. There was ample evidence offered at trial from which the jury could have drawn this conclusion if it had found such a conclusion proper; therefore, evidence of the prior assaults and their eventual conviction would have been more prejudicial than probative.

Accordingly, I dissent.