609 A.2d 1338

**COMMONWEALTH of Pennsylvania**

v.

**Robert A. BERKOWITZ, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 9, 1990.

Filed May 19, 1992.

Petition for Allowance of Appeal Granted Sept. 22, 1992.

506

Michael M. Mustokoff, Huntingdon, for appellant.

Jane Roach, Asst. Dist. Atty., Stroudsburg, for Com., appellee.

Before WIEAND, KELLY and CERCONE, JJ.

## OPINION

PER CURIAM:

Appellant appeals from judgment of sentence imposed following convictions of rape and indecent assault. We are called upon to determine the degree of physical force necessary to complete the act of rape in Pennsylvania. We find that under the totality of the circumstances, evidence of sufficient force was not adduced herein. We are also asked to decide whether the trial court improperly excluded evidence of the victim's motive to fabricate the charge of indecent assault. We find that it did. Accordingly, we discharge appellant on the rape conviction and reverse and remand for a new trial on the indecent assault conviction.

## I. FACTS AND PROCEDURAL HISTORY

In the spring of 1988, appellant and the victim were both college sophomores at East Stroudsburg State University, ages twenty and nineteen years old, respectively. They had mutual friends and acquaintances. On April nineteenth of that year, the victim went to appellant's dormitory room.

What transpired in that dorm room between appellant and the victim thereafter is the subject of the instant appeal.

During a one day jury trial held on September 14, 1988, the victim gave the following account during direct examination by the Commonwealth. At roughly 2:00 on the afternoon of April 19, 1988, after attending two morning classes, the victim returned to her dormitory room. There, she drank a martini to "loosen up a little bit" before going to meet her boyfriend, with whom she had argued the night before. N.T. 9/14/88 at 24. Roughly ten minutes later she walked to her boyfriend's dormitory lounge to meet him. He had not yet arrived.

Having nothing else to do while she waited for her boyfriend, the victim walked up to appellant's room to look for Earl Hassel, appellant's roommate. She knocked on the door several times but received no answer. She therefore wrote a note to Mr. Hassel, which read, "Hi Earl, I'm drunk. That's not why I came to see you. I haven't seen you in a while. I'll talk to you later, [victim's name]." *Id.* at 27. She did so, although she had not felt any intoxicating effects from the martini, "for a laugh." *Id.*

After the victim had knocked again, she tried the knob on the appellant's door. Finding it open, she walked in. She saw someone lying on the bed with a pillow over his head, whom she thought to be Earl Hassel. After lifting the pillow from his head, she realized it was appellant. She asked appellant which dresser was his roommate's. He told her, and the victim left the note.

Before the victim could leave appellant's room, however, appellant asked her to stay and "hang out for a while." *Id.* at 31. She complied because she "had time to kill" and because she didn't really know appellant and wanted to give him "a fair chance." *Id.* Appellant asked her to give him a back rub but she declined, explaining that she did not "trust" him. *Id.* Appellant then asked her to have a seat on his bed. Instead, she found a seat on the floor, and

conversed for a while about a mutual friend.[1] No physical contact between the two had, to this point, taken place.

Thereafter, however, appellant moved off the bed and down on the floor, and "kind of pushed [the victim] back with his body. It wasn't a shove, it was just kind of a leaning-type of thing." *Id.* at 32. Next appellant "straddled" and started kissing the victim. The victim responded by saying, "Look, I gotta go. I'm going to meet [my boyfriend]." *Id.* Then appellant lifted up her shirt and bra and began fondling her. The victim then said "no." *Id.*

After roughly thirty seconds of kissing and fondling, appellant "undid his pants and he kind of moved his body up a little bit." *Id.* at 34. The victim was still saying "no" but "really couldn't move because [appellant] was shifting at [her] body so he was over [her]." *Id.* Appellant then tried to put his penis in her mouth. The victim did not physically resist, but rather continued to verbally protest, saying "No, I gotta go, let me go," in a "scolding" manner. *Id.* at 36.

Ten or fifteen more seconds passed before the two rose to their feet. Appellant disregarded the victim's continual complaints that she "had to go," and instead walked two feet away to the door and locked it so that no one from the outside could enter.[2]

Then, in the victim's words, "[appellant] put me down on the bed. It was kind of like—he didn't throw me on the bed. It's hard to explain. It was kind of like a push but no...." *Id.* at 38. She did not bounce off the bed. "It wasn't slow like a romantic kind of thing, but it wasn't a fast shove either. It was kind of in the middle." *Id.* at 39.

Once the victim was on the bed, appellant began "straddling" her again while he undid the knot in her sweatpants. *Id.* He then removed her sweatpants and underwear from

1. On cross-examination, the victim testified that during this conversation she had explained she was having problems with her boyfriend. N.T. 9/14/88 at 54.

2. The victim testified that she realized at the time that the lock was not of a type that could lock people inside the room. N.T. 9/14/88 at 61.

one of her legs. The victim did not physically resist in any way while on the bed because appellant was on top of her, and she "couldn't like go anywhere." *Id.* She did not scream out at anytime because, "[i]t was like a dream was happening or something." *Id.*

Appellant then used one of his hands to "guide" his penis into her vagina. *Id.* at 41. At that point, after appellant was inside her, the victim began saying "no, no to him softly in a moaning kind of way ... because it was just so scary." *Id.* at 40. After about thirty seconds, appellant pulled out his penis and ejaculated onto the victim's stomach. *Id.* at 42.

Immediately thereafter, appellant got off the victim and said, "Wow, I guess we just got carried away." *Id.* at 43. To this the victim retorted, "No, we didn't get carried away, you got carried away." *Id.* The victim then quickly dressed, grabbed her school books and raced downstairs to her boyfriend who was by then waiting for her in the lounge.

Once there, the victim began crying. Her boyfriend and she went up to his dorm room where, after watching the victim clean off appellant's semen from her stomach, he called the police.

Defense counsel's cross-examination elicited more details regarding the contact between appellant and the victim before the incident in question. The victim testified that roughly two weeks prior to the incident, she had attended a school seminar entitled, "Does 'no' sometimes means 'yes'?" *Id.* at 50, 74. Among other things, the lecturer at this seminar had discussed the average length and circumference of human penises. *Id.* at 50, 75. After the seminar, the victim and several of her friends had discussed the subject matter of the seminar over a speaker-telephone with appellant and his roommate Earl Hassel. *Id.* at 76. The victim testified that during that telephone conversation, she had asked appellant the size of his penis. *Id.* at 50, 76. According to the victim, appellant responded by suggesting

that the victim "come over and find out." *Id.* at 76. She declined. *Id.*

When questioned further regarding her communications with appellant prior to the April 19, 1988 incident, the victim testified that on two other occasions, she had stopped by appellant's room while intoxicated. *Id.* at 51–52. During one of those times, she had laid down on his bed. *Id.* at 51. When asked whether she had asked appellant again at that time what his penis size was, the victim testified that she did not remember.[3]

Appellant took the stand in his own defense and offered an account of the incident and the events leading up to it which differed only as to the consent involved. According to appellant, the victim had begun communication with him after the school seminar by asking him of the size of his penis and of whether he would show it to her. *Id.* at 124. Appellant had suspected that the victim wanted to pursue a sexual relationship with him because she had stopped by his room twice after the phone call while intoxicated, laying down on his bed with her legs spread and again asking to see his penis. *Id.* at 125, 127. He believed that his suspicions were confirmed when she initiated the April 19, 1988 encounter by stopping by his room (again after drinking), and waking him up. *Id.* at 128–129.

Appellant testified that, on the day in question, he did initiate the first physical contact, but added that the victim warmly responded to his advances by passionately returning his kisses. *Id.* at 130. He conceded that she was continually "whispering ... no's," *id.* at 134, but claimed that she did so while "amorously ... passionately" moaning. *Id.* at 132–133. In effect, he took such protests to be thinly veiled acts of encouragement. When asked why he locked the door, he explained that "that's not something you want somebody to just walk in on you [doing.]" *Id.* at 139.

3. The victim was unsure of exactly what date these events took place. *See* N.T. 9/14/88 at 51.

According to appellant, the two then laid down on the bed, the victim helped him take her clothing off, and he entered her. He agreed that the victim continued to say "no" while on the bed, but carefully qualified his agreement, explaining that the statements were "moaned passionately." *Id.* at 140–142. According to appellant, when he saw a "blank look on her face," he immediately withdrew and asked "is anything wrong, is something the matter, is anything wrong." *Id.* at 143–44. He ejaculated on her stomach thereafter because he could no longer "control" himself. *Id.* at 144. Appellant testified that after this, the victim "saw that it was over and then she made her move. She gets right off the bed ... she just swings her legs over and then she puts her clothes back on." *Id.* Then, in wholly corroborating an aspect of the victim's account, he testified that he remarked, "Well, I guess we got carried away," to which she rebuked, "No, we didn't get carried, you got carried away'" *Id.* at 145.

After hearing both accounts, the jury convicted appellant of rape and indecent assault. Defense counsel filed post-verdict motions alleging numerous trial court errors. Before the trial court could rule on these motions, appellant retained new counsel who filed supplemental post-verdict motions. The trial court held a hearing on the motions and, finding no merit in them, denied appellant post-verdict relief. Appellant was then sentenced to serve a term of imprisonment of one to four years for rape and a concurrent term of six to twelve months for indecent assault. Post-trial bail was granted pending this timely appeal.

On appeal, counsel for appellant has presented this Court with the following issues.

1. Did the trial court err in failing to define "forcible compulsion" as requested by counsel, in accordance with *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986)?

2. Did the trial court err in its denial of defendant's pretrial motion to explore complaint's [sic] sexual infidelity to her boyfriend, which was the basis for continued

arguments between them and provided a clear motive to fabricate a rape and thus was exculpatory to the defendant?

3. Is there sufficient evidence of "forcible compulsion" to support a rape conviction where the uncontroverted facts established "reluctant submission"?

4. Was trial counsel ineffective in his failure to explore the use of character witnesses to be called on behalf of the defendant to testify as to his reputation for honesty and peacefulness?

5. Did the prosecutor's comment during her closing that the jury should "rest assured that somebody in his (the defendant's) position in a case like this is not treated the same as a brutal stranger", relieve the jury of its sense of responsibility for its verdict and thus deprive defendant of a fair trial?

6. Did the trial court err in refusing defendant's motion for reconsideration requesting that defendant's sentence for indecent assault be vacated because of the doctrine of merger?

Appellant's Brief at 1–3. Since a finding of merit in the third issue would require the most encompassing relief for appellant, it is best addressed first.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant's argument in this regard was well summarized by appellant's counsel in his brief.

The issues on appeal are real. At sentencing, they were recognized by the trial court as being on the cutting edge of the criminal jurisprudence of this Commonwealth:

*The Court:* Well, I'm comforted by the knowledge that whatever happens here today will certainly not end this case. This is going to go on and on for some time for just the very reason you suggested Mr. Mustokoff [present counsel for appellant], and that being that this case is on the cutting edge. (R.R. 499a).

Mr. Berkowitz prays that this Court overturns his rape conviction. He asks that this Court define the parame-

ters between what may have been unacceptable social conduct and the criminal conduct necessary to support the charge for forcible rape.

We contend that upon review, the facts show no more than what legal scholars refer to as "reluctant submission". The complainant herself admits that she was neither hurt nor threatened at any time during the encounter. She admits she never screamed or attempted to summon help. The incident occurred in a college dormitory in the middle of the afternoon.

There has never been an affirmed conviction for forcible rape under similar circumstances. Not one factor which this Court has considered significant in prior cases, exists here. The uncontroverted evidence fails to establish forcible compulsion.

Appellant's Brief at 10.

The Commonwealth counters:

Viewing the evidence and its inferences in the light most favorable to the Commonwealth, the jury's conclusion that the Defendant's forcible conduct overcame [the victim's] will is reasonable. The assault was rapid and the victim was physically overcome. Because she was acquainted with the Defendant, [the victim] had no reason to be fearful or suspicious of him and her resorting to verbal resistance only is understandable. More importantly, perhaps, it is only her lack of consent that is truly relevant. It is entirely reasonable to believe that the Defendant sat on her, pushed her on the bed and penetrated her before she had time to fully realize her plight and raise a hue and cry. If the law required active resistance, rather the simple absence of consent, speedy penetration would immunize the most violent attacks and the goal-oriented rapist would reap an absurd reward. Certainly a victim must communicate her objections. But, contrary to the Defendant's arguments, Pennsylvania law says she can "just say no." [The victim] said "no." She said it repeatedly, clearly and sternly. She

was rapidly, forcibly raped and deserves the protection of the law.

Commonwealth's Brief at 6. With the Commonwealth's position, the trial court agreed. We cannot.

 In viewing the evidence, we remain mindful that credibility determinations were a matter solely for the fact finder below. *Commonwealth v. Murray,* 408 Pa.Super. 435, 440, 597 A.2d 111, 114 (1991) (*en banc*). On appeal, we must examine the evidence in the light most favorable to the Commonwealth drawing all reasonable inferences therefrom. *Commonwealth v. Bryant,* 524 Pa. 564, 567, 574 A.2d 590, 592 (1990); *Commonwealth v. Ables,* 404 Pa.Super. 169, 173–77, 590 A.2d 334, 336–37 (1991); *Commonwealth v. Rue,* 362 Pa.Super. 470, 476, 524 A.2d 973, 976 (1987); *Commonwealth v. Sanders,* 339 Pa.Super. 373, 378, 489 A.2d 207, 209 (1985); *Commonwealth v. Robinson,* 316 Pa.Super. 152, 155, 462 A.2d 840, 841 (1983); *Commonwealth v. Combs,* 298 Pa.Super. 527, 529, 445 A.2d 113, 114 (1982). If a jury could have reasonably determined from the evidence adduced that all of the necessary elements of the crime were established, then the evidence will be deemed sufficient to support the verdict.

In Pennsylvania, the crime of rape is defined by statute as follows:

A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent.

18 Pa.C.S.A. § 3121. A statutory caveat to this rule may be found in section 3107 of title 18.

### Resistance Not Required

The alleged victim need not resist the actor in prosecution under this chapter: Provided, however, that nothing in this section shall be construed to prohibit a defendant from introducing evidence that the alleged victim consented to the conduct in question.

■ The contours of Pennsylvania's rape statute, however, are not immediately apparent. As our Supreme Court explained in the landmark case, *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986):

"[F]orcible compulsion" as used in section 3121(1) includes not only physical force or violence but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will.

Closely related to section 3121(1) is section 3121(2) which applies to the situation where "forcible compulsion" is not actually used but is threatened. That section uses the phrase "by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." The Model Penal Code used the terminology "compels her to submit by any threat that would prevent resistance by a woman of ordinary resolution" and graded that offense as gross sexual imposition, a felony of the third degree. The Pennsylvania legislature rejected the concept that sexual intercourse compelled by "gross imposition" should be graded as a less serious offense and, therefore, enacted section 3121(2). By use of the phrase "person of reasonable resolution," the legislature introduced an objective standard regarding the use of *threats* of forcible compulsion to prevent resistance (as opposed to actual application of "forcible compulsion.")

*The determination of whether there is sufficient evidence to demonstrate beyond a reasonable doubt that an accused engaged in sexual intercourse by forcible compulsion* (which we have defined to include "not only physical force or violence, but also moral, psychological or intellectual force used to compel a person to engage in

sexual intercourse against that person's will," *supra*, at 1226), or by the threat of such forcible compulsion that would prevent resistance by a person of reasonable resolution *is, of course, a determination that will be made in each case based upon the totality of the circumstances that have been presented to the fact finder.* Significant factors to be weighed in that determination would include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. This list of possible factors is by no means exclusive.

*Id.*, 510 Pa. at 557, 510 A.2d at 1226–27 n. 15 (footnote 14 omitted) (emphasis added).[4]

Before us is not a case of mental coercion. There existed no significant disparity between the ages of appellant and the victim. They were both college sophomores at the time of the incident. Appellant was age twenty; the victim was nineteen. The record is devoid of any evidence suggesting that the physical or mental condition of one party differed from the other in any material way. Moreover, the atmosphere and physical setting in which the incident took place was in no way coercive. The victim walked freely into appellant's dorm room in the middle of the afternoon on a school day and stayed to talk of her own volition. There was no evidence to suggest that appellant was in any position of authority, domination or custodial control over the victim. Finally, no record evidence indicates that the victim was under duress. Indeed, nothing in the record

---

**4.** We note that in 1988, a plurality of our Supreme Court decided *Commonwealth v. Mlinarich*, 518 Pa. 247, 542 A.2d 1335 (1988). To the extent that this plurality decision may be seen to revise the majority holding in *Commonwealth v. Rhodes, supra*, it has been rejected as non-binding precedent. *See Commonwealth v. Ruppert*, 397 Pa.Super. 132, 138 n. 6, 579 A.2d 966, 969 n. 6 (1990); *Commonwealth v. Dorman*, 377 Pa.Super. 419, 427, 547 A.2d 757, 761 (1988). We therefore decline to follow it herein.

manifests any intent of appellant to impose "moral, psychological or intellectual" coercion upon the victim. *See and compare Commonwealth v. Rhodes, supra* (position of authority, isolated area of the incident and explicit commands sufficient to prove mental coercion); *Commonwealth v. Ables, supra,* 404 Pa.Superior Ct. at 177–179, 590 A.2d at 338 (position of trust and confidence coupled with emotional exploitation sufficient to establish moral coercion); *Commonwealth v. Ruppert,* 397 Pa.Super. 132, 579 A.2d 966 (1990) (father-daughter relationship coupled with showing of sexually explicit pictures sufficient to establish psychological coercion); *Commonwealth v. Frank,* 395 Pa.Super. 412, 577 A.2d 609 (1990) (therapist-patient relationship coupled with threat sufficient for psychological coercion); *Commonwealth v. Dorman, supra* (appellant's position of authority and trust and remote location of the incident sufficient to establish psychological coercion).

Nor is this a case of a threat of forcible compulsion. When asked by defense counsel at trial whether appellant had at any point threatened her in any manner, the victim responded, "No, he didn't." N.T. 9/14/88 at 67, 71. Moreover, careful review of the record fails to reveal any express or even implied threat that could be viewed as one which, by the objective standard applicable herein, "would prevent resistance by a person of reasonable resolution." 18 Pa.C.S.A. § 3121(2). *Compare Commonwealth v. Poindexter,* 372 Pa.Super. 566, 539 A.2d 1341 (1989) (father's reproaches and threats sufficient to establish coercion toward daughters); *Commonwealth v. Williams,* 294 Pa.Super. 93, 439 A.2d 765 (1982) (threat that victim would be killed if she resisted sufficient to establish forcible compulsion).

Rather, the Commonwealth contends that the instant rape conviction is supported by the evidence of actual physical force used to complete the act of intercourse. Essentially, the Commonwealth maintains that, viewed in the light most favorable to it, the record establishes that the victim did not consent to engage in the intercourse, and

thus, any force used to complete the act of intercourse thereafter constituted "forcible compulsion."

In response, appellant urges that the victim's testimony itself precludes a finding of "forcible compulsion." Appellant essentially argues that the indisputable lack of physical injuries and physical resistance proves that the evidence was insufficient to establish rape.

■ In beginning our review of these arguments, it is clear that any reliance on the victim's absence of physical injuries or physical resistance is misplaced. Although it is true that the instant victim testified that she was not "physically hurt in any fashion," N.T. 9/14/88 at 68, and that it was "possible that [she] took no physical action to discourage [appellant]," *id.* at 59, such facts are insignificant in a sufficiency determination. As our Supreme Court has made clear, " 'rape . . . is defined, not in terms of the physical injury to the victim, but in terms of the effect it has on the victim's volition.' " *Commonwealth v. Rhodes, supra,* 510 Pa. at 555, 510 A.2d at 1226 (*quoting Commonwealth v. Irvin,* 260 Pa.Super. 122, 393 A.2d 1042, 1044 (1978)); *see also Commonwealth v. Dorman, supra,* 377 Pa.Superior Ct. at 429, 547 A.2d at 762; 18 Pa.C.S.A. § 3121 (defining rape by the quality or magnitude of forcible compulsion employed by the actor, not by the presence or severity of the victim's injuries). Similarly, our legislature has expressly commanded that the "victim *need not resist* the actor in prosecutions under" Chapter 31. *See* 18 Pa. C.S.A. § 3107 (emphasis added). As the *Rhodes* Court observed, this legislative mandate was intended to make it clear that "lack of consent is not synonymous with lack of resistance." *Commonwealth v. Rhodes, supra,* 510 Pa. at 557, 510 A.2d at 1227 n. 14. Thus, while the *presence* of actual injury or physical resistance might well indicate "forcible compulsion," we are compelled to conclude that the absence of either or both is not fatal to the Commonwealth's case.[5]

5. That the victim need not resist "forcible compulsion" to later prove rape may be seen through an examination of the history of the resistance requirement in Pennsylvania. Traditionally, Pennsylvania law looked with peculiar suspicion upon the rape complaint. Due in

What is comparatively uncertain, however, in the absence of either an injury or resistance requirement, is the precise degree of actual physical force necessary to prove "forcible compulsion." As the *Rhodes* Court has made clear, no precise definition of the term "forcible compulsion" may be found.

part perhaps to Lord Chief Justice Matthew Hale's now infamous seventeenth century remonstration: "Rape is an accusation easily to be made and hard to be proved, and harder still to be defended by the party accused, tho never so innocent," Hale, *History of the Pleas of the Crown,* vol. 1, 634 (R.H. Small 1847), accusations of rape were reviewed with a scrutiny unparalleled by the review given to any other criminal complaint. For example, in 1875, our Supreme Court upheld an instruction that, "in order to guard against false charges in cases of this kind—it has been deemed an important test of the sincerity of the woman, that while the commission of the offense was in progress, she cried aloud, struggled and complained on the first opportunity, and prosecuted the offender without delay." *Stevick v. Commonwealth,* 78 Pa. 460, 460 (1875) (referring vaguely to Lord Chief Justice Hale's remonstration). Thereafter, countless reporters contained admonitions to the trial courts to bring to the attention of jurors the significance of actual "bona fide" resistance, outcry and prompt complaint. *See e.g. Commonwealth v. Berklowitz,* 133 Pa.Super. 190, 193–94, 2 A.2d 516 (1938) (conviction, based on evidence that the defendants, who were strangers to the victim, kidnapped the victim, drove her to a club seven miles away where she sipped drinks with the defendants and roughly 150 others, drove her thereafter to a vacant lot and had intercourse with her forcibly and against her will, reversed for failure to charge on significance of the absence of a prompt complaint and resistance); *Commonwealth v. Moran,* 97 Pa.Super. 120 (1929) (conviction, based on evidence that the defendants, with whom the victim had been acquainted, forced the victim into the grandstand of a baseball park, held down her shoulders and had intercourse with her, reversed for failure to charge on meaning of "bona fide" resistance).

In 1973 and 1976, however, our Legislature enacted several amendments to the Crimes Code which removed many of the obstacles in the path of rape prosecutions. The effect of the reforms was dramatic. The "pernicious 'special rules'" governing rape prosecutions which had become a tradition in Pennsylvania were effectively abrogated by these amendments. *Commonwealth v. Rhodes, supra,* 510 A.2d at 1223 n. 11. As our Supreme Court made clear, "[m]odern social, legal and psychological thinking has thoroughly discredited these 'special rules,' and our Crimes Code, with amendments in 1973 and 1976, has finally discarded the last vestiges of these ill-conceived rules." *Id.*

Among the changes in rape law brought about by the amendments is that which annulled the resistance requirement. *See* 18 Pa.C.S.A. § 3107. Thus, for us to hold that a victim must resist "forcible compulsion" would be to ignore the history and defy the intent of the present no resistance requirement. This we cannot do.

The "force necessary to support convictions for rape and involuntary deviate sexual intercourse *need only be such as to establish lack of consent and to induce the woman to submit without additional resistance ...* The degree of force required to constitute rape [or involuntary deviate sexual intercourse] is *relative* and *depends upon the facts and particular circumstances of the case."* *Commonwealth v. Williams,* 294 Pa.Super. 93, 439 A.2d 765, 768 (1982); *Commonwealth v. Rough,* 275 Pa.Super. 50, 418 A.2d 605 (1980).

*Commonwealth v. Rhodes, supra,* 510 Pa. at 554, 510 A.2d at 1226. *See also Commonwealth v. Ables, supra,* 404 Pa.Superior Ct. at 176, 590 A.2d at 337; *Commonwealth v. Dorman, supra,* 377 Pa.Superior Ct. at 423, 547 A.2d at 758. The *Rhodes* Court specifically refused to "delineate all of the possible circumstances that might tend to demonstrate that sexual intercourse was engaged in by forcible compulsion or by threat of forcible compulsion within the meaning of [title 18] section 3121(1) and (2)." *Commonwealth v. Rhodes, supra,* 510 Pa. at 556, 510 A.2d at 1226. Rather, the Court left that delineation to evolve "in the best tradition of the common law—by development of a body of case law.... [W]hether there is sufficient evidence to demonstrate ... that an accused engaged in sexual intercourse by forcible compulsion ... is, of course, a determination that will be made in each case based on the *totality of the circumstances....*" *Id.,* 510 Pa. at 556, 510 A.2d at 1226 (emphasis added); *see also Commonwealth v. Ables, supra,* 404 Pa.Superior Ct. at 176, 590 A.2d at 337. Thus, the ultimate task for the fact finder remains the question of whether, under the totality of circumstances, "the victim ... was forced to ... engage in sexual intercourse ... *against his or her will."* *Commonwealth v. Rhodes, supra,* 510 Pa. at 557, 510 A.2d at 1227 (emphasis added).

Here, the victim testified that the physical aspects of the encounter began when appellant "kind of pushed me back with his body. It wasn't a shove, it was just kind of a leaning-type thing." N.T. 9/14/88 at 32. *Compare Commonwealth v. Rough, supra* (victim forced to floor and struck). She did not testify that appellant "pinned" her to

the floor with his hands thereafter; she testified that he "started kissing me ... [and] lift[ing] my shirt [and] bra ... straddling me kind of ... shifting at my body so that he was over me." N.T. 9/14/88 at 32–34. *Compare Commonwealth v. Meadows,* 381 Pa.Super. 354, 356–60, 553 A.2d 1006, 1008–09 (1989) (victim "pinned" to the ground despite physical resistance). When he attempted to have oral sex with her, appellant "knelt up straight ... [and] tried to put his penis in my mouth ... and after he obvious-. ly couldn't ... he, we got up." N.T. 9/14/88 at 34–36. Although appellant then locked the door, his act cannot be seen as an attempt to imprison the victim since she knew and testified that the type of lock on the door of appellant's dorm room simply prevented those on the outside from entering but could be opened from the inside without hindrance. *Id.* at 61. *Compare Commonwealth v. Rhodes, supra* (victim imprisoned in car brought to isolated area). Appellant did not push, shove or throw the victim to his bed; he "put" her on the bed, not in a "romantic" way, but not with a "fast shove either." N.T. 9/14/88 at 39. Once on the bed, appellant did not try to restrain the victim with his hands in any fashion. *Id.* at 64. *Compare Commonwealth v. Irvin* (victim choked and her screams muffled by defendant's hands). Rather, while she was "just kind of laying there," he "straddled" her, "quick[ly] undid" the knot in her sweatpants, "took off" her sweatpants and underwear, placed the "weight of his body" on top of her and "guided" his penis inside her vagina. N.T. 9/14/88 at 39–41.

Even in the light most favorable to the Commonwealth, the victim's testimony as to the physical aspects of the encounter cannot serve as a basis to prove "forcible compulsion." The cold record is utterly devoid of any evidence regarding the respective sizes of either appellant or the victim. As such, we are left only to speculate as to the coercive effect of such acts as "leaning" against the victim or placing the "weight of his body" on top of her. This we may not do. *Commonwealth v. Roscioli,* 454 Pa. 59, 62, 309 A.2d 396, 398 (1973); *Commonwealth v. Scott,* 409

Pa.Super. 313, 315, 597 A.2d 1220, 1221 (1991). Moreover, even if the record indicated some disparity in the respective weights or strength of the parties, such acts are not themselves inconsistent with consensual relations. Except for the fact that appellant was on top of the victim before and during intercourse, there is no evidence that the victim, if she had wanted to do so, could not have removed herself from appellant's bed and walked out of the room without any risk of harm or danger to herself whatsoever. These circumstances simply cannot be bootstrapped into sexual intercourse by forcible compulsion.

Similarly inconclusive is the fact that the victim testified that the act occurred in a relatively brief period of time. The short time frame might, without more, indicate that the victim desired the sexual encounter as easily as it might that she didn't, given the fact that no threats or mental coercion were alleged. At most, therefore, the physical aspects of the encounter establishes that appellant's sexual advances may have been unusually rapid, persistent and virtually uninterrupted. However inappropriate, undesirable or unacceptable such conduct may be seen to be, it does not, standing alone, prove that the victim was "forced to engage in sexual intercourse against her will."

The only evidence which remains to be considered is the fact that both the victim and appellant testified that throughout the encounter, the victim repeatedly and continually said "no." [6] Unfortunately for the Commonwealth,

---

6. The accounts differed in this respect only as to the tone in which the word was spoken. Appellant claimed it was whispered "passionately." N.T. 9/14/88 at 134. The victim testified that she voiced her objections *before* the intercourse in a "scolding" manner. *Id.* at 36. At trial, it was peculiarly for the jury to determine the credibility of the parties. *Commonwealth v. Murray, supra.* On appeal, we must view the record in the light most favorable to the Commonwealth. *Commonwealth v. Bryant, supra.* Viewed in this way, we must consider the victim's admonitions *before* the intercourse to be sincere protests. Although the victim testified that *during* the intercourse she "moaned" the word "no," N.T. 9/14/88 at 40, the degree of the ambiguity of her protests at that point is inconsequential for a *sufficiency* determination. By that time, penetration had occurred and the crime, if any, was complete. *See* Pa.C.S.A. § 3121. Such evidence merely went to

under the existing statutes, this evidence alone cannot suffice to support a finding of "forcible compulsion."

Evidence of verbal resistance is unquestionably relevant in a determination of "forcible compulsion." At least twice previously this Court has given weight to the failure to heed the victim's oral admonitions. *See Commonwealth v. Meadows, supra,* 381 Pa.Superior Ct. at 358, 553 A.2d at 1009 (evidence sufficient to convict for rape where "appellant pinned [the victim] to the ground and *knowingly disregarded her efforts to communicate the idea that she did not want to have intercourse.*") (emphasis added); *see also Commonwealth.v. Dorman, supra,* 547 A.2d at 761 (finding evidence of rape sufficient where "[d]espite the victim's protests, appellant ... disrobed her, pushed her down on the seat of the car and had intercourse with her.") (emphasis added). In each such case, however, evidence of verbal resistance was only found sufficient where coupled with a sufficient threat of forcible compulsion, mental coercion, or actual physical force of a type inherently inconsistent with consensual sexual intercourse. *See, e.g. Commonwealth v. Meadows, supra; Commonwealth v. Mlinarich,* 345 Pa.Super. 269, 286, 498 A.2d 395, 403 (1985) (*en banc*), *aff'd* 518 Pa. 247, 542 A.2d 1335 (1988) (plurality) (holding that "rape, as defined by the legislature at 18 Pa.C.S. § 3121(a) ... required *actual physical compulsion or violence....*"). Thus, although evidence of verbal protestations may be relevant to prove that the intercourse was against the victim's will, it is not dispositive or sufficient evidence of "forcible compulsion."

If the legislature had intended to define rape, a felony of the first degree, as non-consensual intercourse, it could have done so. It did not do this. It defined rape as sexual intercourse by "forcible compulsion." *Compare* 18 Pa. C.S.A. § 3126 (defining indecent assault as "indecent contact with another not [the actor's] spouse ... *without the*

the *weight* to attach to the victim's credibility. *See Commonwealth v. Pearsall,* 368 Pa.Super. 327, 329–30, 534 A.2d 106, 108 (1987). Moreover, the victim carefully explained that her "moaning" during intercourse was in no way "passionate." N.T. 9/14/88 at 65.

*consent* of the other person.") (emphasis added). If the legislature means what it said, then where as here no evidence was adduced by the Commonwealth which established either that mental coercion, or a threat, or force inherently inconsistent with consensual intercourse was used to complete the act of intercourse, the evidence is insufficient to support a rape conviction.[7] Accordingly, we hold that the trial court erred in determining that the evidence adduced by the Commonwealth was sufficient to convict appellant of rape.

## III. RAPE SHIELD LAW

Having found appellant's rape conviction insufficient, we must determine whether any of appellant's allegations of trial error relating to the remaining conviction have merit. He argues, *inter alia,* that the trial court erred in applying the Rape Shield Law to exclude evidence that the victim may have denied consent to avoid the wrath of a jealous boyfriend. In light of the prosecution's emphasis upon the lack of any motive to fabricate and the possibility of permitting some evidence upon this subject without unduly encroaching upon the legislatively provided Rape

7. It may be argued that our conclusion requires the victim, whose *verbal* resistance did not deter the sexual advances, to *physically* resist, in violation of the "no resistance requirement," 18 Pa.C.S.A. § 3107. *See* note 5, *supra.* In this regard, we note the following. Although the "no resistance requirement" does not, on its face, in any way restrict the situations to which it may apply, it appears that the statute must have limits. Section 3121(2) of title 18, which describes the threat element of rape, states that rape occurs when a person "engages in sexual intercourse with another ... by threat of forcible compulsion *that would prevent resistance* by a person of reasonable resolution" (emphasis added). If the "no resistance requirement" were applied in that setting, the description of the type of threat which is sufficient would be rendered wholly meaningless. To be consistent, therefore, the "no resistance requirement" must be applied only to prevent any *adverse inference* to be drawn against the person who, *while* being "forcibly compelled" to engage in intercourse, chooses not to physically resist. *See* note 5, *supra.* Since there is no evidence that the instant victim was at any time "forcibly compelled" to engage in sexual intercourse, our conclusion is not at odds with the "no resistance requirement."

Shield Law protections, we agree that reversible error occurred.

In determining whether the application of the Rape Shield Law violates a defendant's constitutional rights to confront and cross-examine witnesses against him, this Court has recently held,

In Pennsylvania, we have come to resolve this question through a relatively elaborate procedure which is designed to ensure that no evidence of the victim's sexual history is introduced *unless* and *until* it can be established that to exclude such evidence would lay victim to the very raison d'etre of the trial itself: the pursuit of truth. The process begins with the defendant submitting a *specific* proffer to the court of exactly what evidence he or she seeks to admit and precisely why it is relevant to the defense. *See Commonwealth v. Smith, supra* [410 Pa.Super. 363], 599 A.2d [1340] at 1342 [1991], *Commonwealth v. Nieves, supra* [399 Pa.Super. 277], 582 A.2d [341] at 347 [1990]. This procedure forces the defendant to frame the precise issues and interests involved, and prevents him or her from embarking upon "fishing expedition style intrusions on Rape Shield law protections." *Id.*, 399 Pa.Superior Ct. at 292, 582 A.2d at 349. Where the proffer is but vague and conjectural, evidence of the victim's past sexual conduct will be excluded and no further inquiry need be entertained. *Id.; Commonwealth v. Troy*, 381 Pa.Super. 326, 335, 553 A.2d 992, 996–97 (1989) (plurality).

Where the proffer is sufficiently specific, the court must then undertake a three part analysis of the substance of the proffer. At the trial level, the court must conduct an *in camera* hearing at which they must determine: 1) whether the proffered evidence is *relevant* to the defense at trial; 2) whether the proffered evidence is *cumulative* of evidence otherwise admissible at trial; and 3) whether the proffered evidence is more probative than prejudicial. *Commonwealth v. Smith, supra,* 410 Pa.Superior Ct. at 371, 599 A.2d at 1344; *Commonwealth v. Nieves, supra,* 582 A.2d at 347; *Commonwealth v. Black*, 337 Pa.Super.

548, 557–58, 487 A.2d 396, 401 (1985) (*en banc*). On appeal, such evidentiary rulings must be offered due deference and overturned only where there has been an abuse of discretion. *Commonwealth v. Johnson, supra,* 566 A.2d at 1201. Where, however, the proffered evidence excluded by the Rape Shield law is relevant, noncumulative, and more probative of the defense than prejudicial, it must be admitted. *Commonwealth v. Black, supra,* [337 Pa.Super. 548], 487 A.2d [396] 401, 402 [1985]. *Commonwealth v. Wall,* 413 Pa.Super. 599, 613–615, 606 A.2d 449, 457 (1992).

First we consider whether the proffer was sufficiently specific. Appellant's proffer was as follows:

6. It is also the intention of the Defendant, by and through the testimony of certain non-party witnesses, and by and through the cross-examination of the alleged victim, to place into evidence that the alleged victim had repeated arguments with her boyfriend, [ ], during the 1987–1988 school year, the subject of which was the alleged victim's infidelity and the alleged victim's engaging in sexual intercourse with other men other than the alleged victim's boyfriend, [ ].

7. Said testimony describing the above-referenced paragraph would be offered for the purpose of showing that at the time of the sexual relations between the alleged victim and the Defendant on April 19, 1988, the alleged victim had a disharmonious, quarrelsome relationship with her boyfriend, [ ], and further that the alleged victim may have told her boyfriend that she was "raped" in order to obtain sympathy from her boyfriend and to compel her boyfriend to overlook and forgive the past acts of infidelity. Said evidence would furthermore be offered to defeat the alleged victim's testimony that she had a steady boyfriend, and would therefore not engage in sexual relations with third parties, such as the Defendant, Robert A. Berkowitz.

Appellant's motion under Rape Shield Law at 2–3. While it would be prudent to identify each proposed witness by

name, and to summarize the anticipated testimony in terms of names, dates, locations, and events, we do not find that the proffer, taken as a whole in the context in which it arose, fails to meet a minimum standard of requisite specificity.[8] Essentially, appellant sought to establish that the victim might have lied because she had a jealous boyfriend.

Relevance would be problematic if we were to consider such evidence in a vacuum. Practically every rape case defendant could eviscerate the Rape Shield Law if the mere suggestion of a jealous boyfriend/fabrication theory was sufficient to open the floodgates to permit a wholesale review of the victim's social, interpersonal, and sexual relationships.

However, under the circumstances of this otherwise highly unusual case, the proffered testimony was unmistakably relevant. Appellant's defense theory was essentially that the victim consented to the sex with him but had decided *after* the incident that such consent had been unwise because it may have jeopardized her relationship with her boyfriend. Evidence that the victim had been arguing with her boyfriend over her fidelity might have given the jury cause to question whether the victim had chosen to claim that she had been raped rather than risk the consequences of her boyfriend's discovery that she had consented to sexual intercourse with someone else, *in her boyfriend's dorm.* Given the fact that the victim admitted that it was her boyfriend, not she, who first suggested that she had been raped and who called the police, evidence that the victim and her boyfriend had a history of arguing over her alleged infidelity may have played a significant role in the jury's determination of whether the claim had been fabricated. As such, the evidence was relevant to appellant's defense.

We note that our finding of relevance is not altered by the fact that the theory of defense involves not only the victim and the defendant, but also a third party. In *Com-*

---

**8.** We note that it would have been entirely proper for the trial court to have required a more specific proffer.

*monwealth v. Wall, supra,* this Court was recently present-
ed with a similar question. In that case, a twelve year old
child had alleged that her uncle had sexually abused her
many times over a period of years while her aunt was at
work. There, the record contained evidence that the vic-
tim's aunt had often imposed corporal punishment upon the
victim as a means of discipline and that the victim had
despised such punishment. Moreover, the victim testified
that shortly before she made her first claim of sexual abuse
against her uncle, she had called the police to inform them
of her aunt's severe discipline and had run away from her
aunt and uncle's home during a violent argument to avoid
such discipline. In an effort to show that the victim had
fabricated the claim of sexual abuse against her uncle,
defense sought to introduce evidence that the victim had
been removed from her mother's home and placed with her
aunt and uncle (the defendant) after participating in the
successful sexual abuse prosecution of another adult male,
her mother's paramour. Defense argued that because the
previous prosecution was the very impetus for the victim's
removal from her mother's home, the proffered evidence
tended to establish that the victim fabricated a sexual abuse
claim against her uncle in an effort to prompt her perma-
nent removal from her uncle's home and her aunt's disci-
pline. On appeal, this Court agreed:

> [T]he proffer ... established that the victim participated
> in the *successful* prosecution of her former abuser, and
> that participation [in that prosecution] ultimately lead to
> her *removal from her mother's house.* From this, the
> jury could have inferred that the victim had, at the time
> she alleged that appellant had sexually abused her, la-
> bored under the impression that the making of another
> sexual abuse claim could result in her removal from her
> aunt and uncle's house. The victim's peculiar knowledge
> of the content and of the potential consequences of a
> sexual abuse claim was thus relevant to establish why the
> victim might have chosen to fabricate a specific *type* of
> claim, one of sexual abuse against an adult male in the

house in which she lived and wanted to leave. Given the timing of the victim's allegations of sexual abuse, *i.e.* immediately after a violent argument with her aunt which was prompted in part by the victim's unsuccessful attempt to seek police protection from her aunt's discipline, we conclude that the excluded evidence showing why the victim might have fabricated a claim of sexual abuse against her uncle, was relevant to appellant's defense.

*Commonwealth v. Wall, supra,* 413 Pa.Super. at 624, 606 A.2d at 462 (citations omitted).

In so holding, however, the *Wall* Court made clear that proffered evidence need not, to be considered relevant to a fabrication defense, establish that the victim harbored bias or hostility toward the defendant *per se.* Rather, the *Wall* Court held that *any* evidence which logically tends to show that the claim was fabricated, would be relevant to the defense, as any such evidence tends to "exculpate" the defendant of the charges. *See Commonwealth v. Wall, supra,* 413 Pa.Super. at 619, 606 A.2d at 459–60 n. 16 (*citing Black's Law Dictionary,* 6th Ed. (defining "exculpatory" as "clearing or tending to clear from alleged fault or guilt; excusing.")); *Commonwealth v. Johnson,* 389 Pa.Super. 184, 566 A.2d 1197 (1989) (*en banc*), *appeal granted,* 525 Pa. 643, 581 A.2d 569 (1990) (holding that evidence which is "exculpatory to the defendant" must be admitted to comply with the defendant's constitutional right to confrontation and cross-examination)). It matters not, therefore, the comparative sophistication or complexity of the fabrication scheme envisioned.[9] Where, as here, or as in *Wall,* the proffered evidence logically tends to show that the charges may have been fabricated, the evidence must be deemed relevant.

The evidence was not cumulative. No other evidence of its sort was available to the defense to impeach the victim. The defense was allowed only to establish that the victim

---

9. *Compare Commonwealth v. Black,* 337 Pa.Super. 548, 487 A.2d 396 (1985) (fabrication theory based directly on victim's hostility toward defendant).

and the defendant had "argued." As appellant points out, however, half a loaf was no better than none here. Without bringing to the jury's attention the fact that the victim and her boyfriend had previously argued *about her infidelity,* the jury was without reason to believe that she may have lied about consensual sex with appellant to avoid having her boyfriend hear that she had had sex with appellant.

Finally, while there exists a potential for prejudice, it does not outweigh the probative value of the excluded evidence. Here, the evidence was not that the victim had *actually* been unfaithful to her boyfriend; it was only that her boyfriend and she had argued over the question of her infidelity. The probative value of the excluded evidence, was sufficiently high herein to outweigh any potential for prejudice.

As we have already recognized, the excluded evidence suggested that the victim may have sought to explain away an imprudent act of consensual intercourse with appellant because she feared her boyfriend's jealous reaction if he learned of her decision to do so. This evidence was the sole means to allow the defense an opportunity to convince the jury of the victim's possible mind set upon leaving appellant's dorm room.

However, the excluded evidence gained enhanced relevance and probative value [10] in light of two related developments at trial. First, the prosecution presented evidence that the victim had a steady boyfriend and, inferentially perhaps, that she had no reason to consent to intercourse with another. N.T. 9/14/88 at 23, 90. Second, the Commonwealth took unfair advantage of the exclusion of the motive to fabricate evidence by repeatedly emphasizing the absence of a motive to fabricate in its closing argument:

10. We have noted previously that subsequent events at trial may render otherwise incidental and even inadmissible evidence, highly probative, materially exculpatory and admissible. *See Commonwealth v. Santiago,* 405 Pa.Super. 56, 104–08, 591 A.2d 1095, 1120–21 (*en banc*), *appeal denied,* 600 A.2d 953 (591 E.D.1991, Table).

What you have to ask yourself at this point is this: Why? Why would she lie? You've got to examine her testimony and ask yourself if she's lying. Why ask yourself something like that? You got to have an answer and the real question is why?

\* \* \* \* \* \*

What are the facts of the case? Girl tells you she was forcibly raped and *there's just really no reason to believe she would lie and go through this.* If he jilted her, if she was trying to go out with him and he wouldn't, if she stole money from him or he from her, if they had a fight, *if there was any reason; there's no reason here.* I suggest to you you have to have a reason.

*Id.,* 389 Pa.Super. at 185, 188, 566 A.2d 1197. The combined effect of this conduct by the prosecution was to raise the issue of the victim's social, interpersonal, and sexual relationships and use it as a sword to promote an inference that a person in the victim's circumstances would not have consented to intercourse with the defendant. Once the prosecution raised the issue of motivation in terms of the victim's relationship with her boyfriend and that she had no reason to lie, it then became even more necessary to permit defendant to argue a contrary inference relating to that relationship. The Rape Shield Law was intended to be a shield, not a sword. Here, it was used improperly as a sword.[11]

---

**11.** We note additionally that to the extent the Commonwealth sought to draw an adverse inference from the absence of evidence it successfully *excluded* from trial, such argument was error. *See Commonwealth v. Tumpson,* 242 Pa.Super. 1, 6, 363 A.2d 1129, 1132 (1976) (prosecutor's attempt to exploit absence of witness known to exist but unavailable, was a "deliberate attempt to mislead the jury" and constituted reversible error where no curative instruction was given by trial court); *see also Commonwealth v. Wright,* 255 Pa.Super. 512, 388 A.2d 1084 (1978) (improper to argue inferences from the absence of evidence where such absence was not established at trial); *see generally Commonwealth v. Toth,* 455 Pa. 154, 158, 314 A.2d 275, 278 (1974) (" The district attorney is a quasi-judicial officer ... [who] should present the Commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legiti-

This is not to say that the defendant should have been granted carte blanche to conduct a character assassination campaign under the guise of a fabrication motivation inquiry. Rather, it would have been sufficient to permit defendant to present evidence that the victim's boyfriend had engaged in a series of arguments with her regarding his jealousy and her alleged infidelity to the relationship. We *specifically reject* the suggestion that any evidence regarding the truth or falsity of any alleged instances of infidelity was probative or admissible. To the contrary, the fabrication motivation theory turns upon the *existence* of the boyfriend's jealousy, not its *validity*. Any prejudicial impact of the admission of such evidence could further have been reduced by a carefully constructed limiting instruction.

Finally, we note that on re-trial if the appellant offers or the court requires a more specific proffer, it will then be left to the court to decide what portion of the proffer, if any, is necessary to ensure that the appellant will be able to present his theory of defense consistent with the Rape Shield Law.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the evidence adduced by the Commonwealth was insufficient to convict appellant of rape, and that a new trial is warranted on the indecent assault charge. The remaining issues appellant raises need not be addressed in view of this disposition. Accordingly, we *discharge* appellant as to the rape conviction and *reverse* and *remand* for a new trial in accordance with this opinion.

mate.' ") (quoting *Commonwealth v. Nicely,* 130 Pa. 261, 18 A. 737 (1889).