## Commonwealth v. Canfield

*Bradford Timbers, assistant district attorney,* for the Commonwealth.

*Alfred V.F. Nelthrop,* for defendant.

FORD, *J.,* October 30, 1992—On August 28, 1992, the Commonwealth filed a motion in limine requesting that the court prohibit admission of and reference to acid phosphatase and spermatozoa found in the alleged victim's underpants in these cases charging rape and

related offenses. On September 8, 1992, defendant Robert Canfield filed a motion in limine requesting that the agreement of the Commonwealth, that the semen found in the victim's underpants was not from defendant Canfield, be brought to the attention of the jury and be admitted into evidence. A hearing was conducted, in camera, on these motions on October 1, 1992. The only testimony came from the alleged victim. At the conclusion of the hearing, the court, by granting the motion of the Commonwealth, in effect denied the motion of defendant Canfield.[1] A draft bench opinion was dictated. This memorandum opinion supersedes the draft opinion and incorporates into it record developments since the October 1, 1992 hearing.

## BACKGROUND

The defendants are each charged with two counts of rape,[2] involuntary deviate sexual intercourse,[3] aggravated indecent assault,[4] indecent assault,[5] and one count of criminal conspiracy.[6]

A proper understanding of the subject issue and of the court's rulings on the motions in these cases requires a review of what occurred at prior hearings.

On March 10, 1992, defendant Canfield filed his first "omnibus pre-trial motion" which included, under section II, "motion for DNA tests," an allegation that

---

1. The court, simultaneous with this opinion, enters an amended order in these cases to correct the omission of reference to this motion of defendant Canfield.

2. 18 Pa.C.S. §3121(1), (2) and (3).

3. 18 Pa.C.S. §3123(1), (2) and (3).

4. 18 Pa.C.S. §3125(1) and (4).

5. 18 Pa.C.S. §3126(1) and (4).

6. 18 Pa.C.S. §903(a)(1) and (2).

"samples were recovered at the scene containing acid phosphatase and spermatozoa, particularly in the victim's underpants." (Omnibus pretrial motion paragraph 8.) In the motion, defendant Canfield also alleged that the tests could exculpate the defendant and be critical to the defendant's right to a fair trial. (Omnibus pretrial motion paragraph 10.)

A hearing was conducted on this motion on April 20, 1992. At this hearing the parties focused on the stain found in the crotch of the underpants. The Commonwealth created the impression for the court at that hearing that it intended to introduce into evidence at the trial the acid phosphatase and spermatozoa found in the stain in the crotch of the underpants.

On May 1, 1992, the court granted the motion of the defendant. The court ordered the Commonwealth to provide to Cellmark Diagnostics Laboratory samples of the acid phosphatase and spermatozoa and the underpants for analysis. It also ordered that the defendant submit to Cellmark any bodily tissue samples reasonably requested by Cellmark for comparison purposes. The court filed an opinion in support of this May 1, 1992 order in which it set forth the stipulated facts before it.

The Commonwealth and the defendant Canfield had stipulated that the alleged victim was sexually active with her boyfriend, someone other than the defendant, at times prior to the alleged rape with which the defendants are charged. They had stipulated that there will be no testimony that defendant Canfield and the alleged victim had sexual relations prior to the alleged rape. The victim was present at a party with only the defendants in the defendants' apartment when the alleged rape occurred. Defendant Canfield was the only male present during the party. The parties had stipulated

that acid phosphatase and spermatozoa were found in the crotch of the alleged victim's underpants as was proven by the analysis done by the crime laboratory for the Pennsylvania State Police. The underpants were found by the police in the apartment several days after the alleged rape. They had stipulated that the underpants belonged to the alleged victim. (Op. of May 1, 1992 at 1-2.)

The facts and argument before the court centered on the stain in the underpants of the alleged victim. The court addressed and granted testing of that stain. Neither party expressed concerns about anything other than the testing of the stain in the underpants. The court therefore did not speak to any other subjects in its order and opinion.

On July 6, 1992, defendant Canfield filed his "omnibus pretrial motion," the second such motion. Under section I entitled "motion for DNA and blood samples," defendant Canfield alleged that "Cellmark Diagnostic has requested that a full and proper test and comparison cannot be done without an analysis of blood specimens of the victim." (Second omnibus pretrial motion paragraph 5.) The motion avers that total exclusion of defendant Canfield as the source of the substances found in the victim's underpants requires identification of the victim's patterns by the submission of these blood specimens. (Second omnibus pretrial motion paragraph 6.) The prayer of that petition requests that the court order the alleged victim to submit to the extraction of blood samples for the purpose of DNA comparison.

A hearing was conducted on July 13, 1992 on this second omnibus pretrial motion. The Commonwealth approached this hearing differently from the hearing on the first omnibus pretrial motion. At the hearing on July 13, 1992, the assistant district attorney advised

the court that the Commonwealth would stipulate as a matter of fact that any acid phosphatase and spermatozoa found in the alleged victim's underpants were not from the person of defendant Canfield. The Commonwealth made clear to the court that it would not use the contents of the underpants as evidence against the defendants. The stipulation provided defendant Canfield with the outcome he sought from DNA testing, while the first DNA test produced inconclusive results. The court viewed the stipulation, therefore, as a considerable change of position by the Commonwealth and even asked the assistant district attorney why this position was not stated at the time of the hearing on the first omnibus pretrial motion. The assistant district attorney responded that he did not expect the court to grant the first defense motion.

The court denied the second defense motion by its order of July 13, 1992. Noted in that order is the stipulation of the Commonwealth which has just been described. The court also ordered at that time that all testing being performed by Cellmark for this case shall cease.

The concern of the court in entering the May 1, 1992 order was that the Commonwealth would be presenting evidence of acid phosphatase and spermatozoa found in the crotch of the underpants without identifying for the jury their source. The Commonwealth would be asking the jury to infer that such items came from defendant Canfield. The admission of these items, when testing may exist to exclude defendant Canfield as the source of the items, would be improperly prejudicial. Then, at the July 13, 1992 hearing, the Commonwealth agreed with the defense that Robert Canfield was not the source of the items. With this agreement and with the Commonwealth's representation to the court that

it would not present the contents of the underpants to the jury, any improper prejudice to the defendants and the opportunity for speculation by the jury were removed. There was no need for further imposition upon the alleged victim in requiring her to give blood samples in view of this agreement by the Commonwealth.

The parties then filed the motions in limine which generate this opinion. In the Commonwealth's motion in limine, it claims that the entry of any evidence or testimony pertaining to the content of what was found in the crotch of the underpants would be irrelevant and would constitute "a gross violation of the victim's rights under the applicable Rape Shield Law. 18 Pa. C.S. §3104." (Com. mot. limine paragraph 10.) In a motion in limine of defendant Canfield, he alleges that the stipulation on such evidence "should be brought to the attention of the jury since it is exculpatory in nature" and necessary for the defendant to receive a fair trial. (Def. Canfield mot. limine paragraph 8.)

At the hearing on October 1, 1992 on the motions (of the Commonwealth and defense) in limine, the alleged victim testified that she went to the apartment wherein these acts allegedly occurred on the date of September 23, 1991 at 12:30 a.m. She remained in that apartment with the two defendants until she left at about 7 a.m. or 8 a.m. on September 23, 1991. She and the defendants were alone in the apartment during that period of time with the exception of a child who was sleeping in another room. According to the alleged victim, the crimes were committed by the defendants during the interval from 12:30 a.m. to 7 a.m. or 8 a.m.

The alleged victim testified that she entered the apartment wearing clothing which included a pair of panties.

She also testified that the panties that she put on before she went to work on the afternoon before this incident were clean and had been washed. She had no sexual intercourse with anyone before she left for work on September 22, 1991, and she went from work to the apartment with the defendants in the early morning hours of September 23, 1991.

During argument by counsel, the Commonwealth stated that an ultraviolet test at the hospital detected semen on the person of the alleged victim. The Commonwealth, after insistence by the court for a position by the Commonwealth on use of this testing, represented to the court that it would not introduce the results of the ultraviolet test at trial. The Court had insisted on a definite position from the Commonwealth to prevent the Commonwealth from introducing some evidence of semen from an unidentified source after having argued for excluding other evidence of semen. The court then returned to the motions before it.

Defense counsel requested a court ruling on use at trial of the sex crimes kit resulting from an examination of the victim even though this issue was not raised in any motion. The court refused to rule on a matter not properly before it. Also, this appeared to be more appropriately handled as an evidence matter at trial. The court also deferred ruling on the second defense motions in limine regarding other items seized from the defendant's apartment. (A hearing was held on the motions and rulings made immediately prior to jury selection on October 19, 1992.)

The content of the court's October 1, 1992 orders was available to all counsel from their entry on the record.[7] The court informed counsel at the hearing that

---

7. The signed orders were placed in their respective court files on October 1, 1992. They were filed on October 16, 1992.

it was signing the orders proposed by the Commonwealth. The orders provided that "neither the defendant nor his counsel, nor any witnesses they may call, make any reference, either directly or indirectly, to the semen, the acid phosphatase, the spermatozoa, or the portion of the lab report relating directly thereto, *that related to the alleged victim's underpants* that were recovered from the scene of the alleged crimes charged within." (Orders of October 1, 1992.) (emphasis added) The orders did not preclude the defendants from presenting any evidence other than evidence relating to the content of the underpants. In fact, the court refused to rule on matters outside of the two motions before it. Two weeks later, on October 15, 1992, the court denied the defense requests for certification of an issue for appeal from the October 1, 1992 orders.[8]

The subject cases were called for trial on October 19, 1992. The court again refused to exclude, pre-trial, the use of the sex crimes kit based upon an *oral* defense motion in limine because it wanted to see how the kit and testimony relating to it became relevant.

Defendant Canfield then entered a nolo contendere plea to a charge of "criminal conspiracy to perform involuntary deviate sexual intercourse." Sentencing is scheduled for November 30, 1992.

The trial in *Commonwealth v. Alama* commenced on October 19, 1992 with voir dire which voir dire continued into October 20, 1992. On October 20, 1992, the Supreme Court of Pennsylvania granted petitions for stay of proceedings in these cases which petitions were filed by the defense on October 16, 1992. These petitions challenge the October 1, 1992 ruling by this

---

8. The orders denying certification were filed on October 16, 1992.

court on the motions in limine. Thus, trial in *Commonwealth v. Alama* was stayed.

### DISCUSSION

It is the contention of both defendants that the Commonwealth's motion in limine should be denied for several reasons. First, the defense asserts that the evidence of acid phosphatase and spermatozoa found in the underpants constitutes exculpatory evidence. The defense wants to present expert testimony which would be to the effect that the acid phosphatase and spermatozoa did not come from defendant Canfield. Second, the defense points to the testimony at the in camera hearing on the motions in limine when the alleged victim testified that the panties that she wore when she went to work had been washed and that she had no sexual intercourse with anyone before she left for work on September 22, 1991. Under these circumstances, the defense argues that this indicates a serious credibility problem with this alleged victim in that acid phosphatase and spermatozoa in the crotch of the underpants demonstrates that there was sex with some third party before she entered the apartment. Third, during argument on the motions in limine, counsel for defendant Alama indicated that his defense theory involved an abusive or jealous boyfriend of the alleged victim as an explanation why she would allege rape by the defendants.

18 Pa.C.S. §3104 provides as follows:

"(a) General rule.—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent

of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

"(b) Evidentiary proceedings.—A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a)."

In deciding whether the application of the Rape Shield Law violates the defendant's constitutional rights to confront and cross-examine witnesses, the Pennsylvania appellate courts have enunciated a procedure in determining the admissibility of the evidence. First, the defendant must submit a specific offer of proof to the court of exactly what evidence he or she seeks to admit and precisely why it is relevant to the defense. This will prevent "fishing expedition style intrusions on Rape Shield Law protections." *Commonwealth v. Berkowitz,* 415 Pa. Super. 505, 526, 609 A.2d 1338, 1349 (1992) (per curiam) (quoting *Commonwealth v. Wall* 413 Pa. Super. 599, 614, 606 A.2d 449, 457 (1992)). If the proffer is vague and conjectural, the evidence of the victim's past sexual conduct will be excluded and the inquiry ends.

If the defense is able to make a specific offer of proof, the court then undertakes a three part analysis of the substance of the offer of proof. In the in camera hearing the court must determine: "(1) whether the proffered evidence is *relevant* to the defense at trial; (2) whether the proffered evidence is *cumulative* of evidence otherwise admissible at trial; and (3) whether

the proffered evidence is more probative than prejudicial." *Id.* at 526, 609 A.2d at 1349 (quoting *Commonwealth v. Wall, supra* at 615, 606 A.2d at 457). (emphasis in original)

In discussing the Rape Shield Law, the procedure addressed by the Superior Court begins with the defendant's submitting a specific proffer to the court of exactly what evidence he or she seeks to admit and why it is relevant to the defense. The procedure in this case necessitated a somewhat different approach in that the issue is brought to this court by means of a motion in limine filed by the Commonwealth as well as a motion in limine by defendant Canfield. However, each step of the analysis in the Rape Shield Law procedure was addressed by this court in reaching a decision on these motions in limine.

Permitting evidence as to spermatozoa and acid phosphatase would place before the jury information that the alleged victim had sexual intercourse with an individual other than defendant Canfield at a time or times prior to the alleged assault. The introduction of the testimony would therefore have a tendency to smear the character of the alleged victim, the prevention of which is a primary purpose of the Rape Shield Law. Excluding the evidence under the Rape Shield Law preserves for the defense the same arguments it would have if the court allowed the jury to hear this evidence except, in light of the court's ruling, the defense will not be able to explore the victim's irrelevant sexual relations with others. By granting the Commonwealth's motion in limine, the evidence as to the spermatozoa and acid phosphatase would not be heard by the jury but the defense could still argue defenses to the jury as diverse as consent, the absence of any evidence (acid phosphatase, spermatozoa and semen) of sexual conduct

between the defendants and the alleged victim, and coercions of defendant Alama by defendant Canfield into performing the alleged sexual acts on the victim. Granting the Commonwealth's motion in limine deprives the defense of nothing and upholds the purpose of the Rape Shield Law. The evidence is not exculpatory. See *Commonwealth v. Johnson,* 389 Pa. Super. 184, 195-96, 566 A.2d 1197, 1202 (1989) (en banc), *appeal granted,* 525 Pa. 643, 581 A.2d 569 (1990) (the Rape Shield Law bars testimony of prior sexual conduct involving the victim that is not exculpatory to the defendant).

The second argument posed by the defense is that the introduction of the evidence is important to attack the credibility of the victim. The introduction of such testimony under this theory would be to permit the defense to attack the witness on a clearly collateral point. The court believes that allowing this evidence would cause a material distraction from the ultimate relevant issue in this case of whether or not the defendants assaulted the alleged victim. Considerable distraction from relevant issues appears likely because of proof issues necessarily associated with the stain in the underpants, for example, the age of the stain. The probative value of the evidence would be slight at most. That minimal value is also outweighed by relevancy considerations and impermissible prejudice to the victim which the Rape Shield Law is designed to preclude. See *Commonwealth v. Smith,* 410 Pa. Super. 363, 371, 599 A.2d 1340, 1342 (1991) (evidence must be relevant, more probative than prejudicial and not cumulative).

Finally, in the hearings that have been conducted in this case, the court has not heard any specific proffer as to a jealous boyfriend of the alleged victim. As stated, there only was brief oral argument by counsel for de-

fendant Alama that perhaps an abusive or jealous boy-
friend is involved. Denying the Commonwealth's mo-
tion in limine with only this conjectural reference to
a boyfriend is not permitted. In the context of this matter
the argument by defense counsel fails to meet the stand-
ard of specificity required under the Rape Shield Law.
"Practically every rape case defendant could eviscerate
the Rape Shield Law if the mere suggestion of a jealous
boyfriend/fabrication theory was sufficient to open the
floodgates to permit a wholesale review of the victim's
social, interpersonal, and sexual relationships." *Berk-
owitz, supra* at 528, 609 A.2d at 1349-50. Unlike in
*Berkowitz,* where a sufficiently specific time frame and
events were alleged, defense counsel in this matter did
not provide a basis for his assertion that an abusive
or jealous boyfriend, or even a disharmonious rela-
tionship, existed. The defense position here is similar
to that in *Smith, supra* at 371, 599 A.2d at 1343, where
the defense made only a general attack on credibility.
The court cannot draw a logical connection between
an allegation of fabrication and a void of evidence.
Without more, the court cannot find that this argument
of counsel is more than the fishing expedition style
intrusion on Rape Shield Law protection that the *Berk-
owitz* court included in its discussion of that law. See
*id.* at 526-27, 609 A.2d at 1349.

After careful consideration of the evidence, the proffers
and the arguments of the parties, the court grants the
Commonwealth's motion in limine and denies defendant
Canfield's motion in limine in that the court finds that
the excluded evidence is not relevant and is impermissibly
prejudicial. The granting of the Commonwealth's motion
in limine deprives the defense of nothing and upholds
the purposes of the Rape Shield Law.